2021 IL App (1st) 190366

THIRD DIVISION
March 31, 2021

No. 1-19-0366

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 12809 |
| | ) | |
| ALONZO BELL, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Alonzo Bell, and codefendant, Deandre Brown, who is not a party to this appeal, were charged by indictment with two counts of attempted first degree murder and two counts of aggravated battery with a firearm of the victims, Laquita Weatherspoon and Leemanuel Burrell. Defendant and codefendant were tried jointly by a jury, who, after hearing the evidence, returned verdicts of guilty on all counts. Defendant was thereafter sentenced to 26 years' imprisonment on each of the two attempted first degree murder convictions, which were to be served consecutively.

¶ 2    In this direct appeal from that judgment, defendant argues that the trial court abused its discretion in admitting certain social media evidence at trial, that he was denied his Constitutional

right to the effective assistance of trial counsel, and that his sentence violates the proportionate penalties clause of the Illinois Constitution.

¶ 3    At trial, Weatherspoon testified that on December 17, 2014, she was 19 years old and had plans to go to dinner downtown with her boyfriend, Burrell. Burrell drove a white Mitsubishi, while Weatherspoon sat in the passenger seat. At approximately 8:30 p.m., while on their way to dinner, Weatherspoon and Burrell stopped at Burrell's aunt's house, which was located at 51st and Ada Streets. Burrell parallel parked, and then began looking for his phone, while Weatherspoon looked at her phone.

¶ 4    Weatherspoon then noticed a car driving slowly down Ada Street, stopping near the front of the Mitsubishi. Weatherspoon also saw a second car pull up behind the first. She heard Burrell say, "What?" and then saw two men standing next to her window holding guns. Weatherspoon testified that both men had their right arms extended out from their bodies with guns in their right hands pointed at Weatherspoon and Burrell. Weatherspoon heard the first shot, then attempted to crawl for cover into the Mitsubishi's backseat. Weatherspoon estimated that she heard approximately 30 gunshots. When the shooting stopped, Weatherspoon looked up and saw that the gunmen, and both cars, were gone. Weatherspoon looked at Burrell and saw that he had been shot in the head and arm.

¶ 5    Although she was not initially aware of her injuries, Weatherspoon was shot twice in her lower body, suffering injuries where each bullet entered and exited her body. Weatherspoon was able to exit the vehicle and, at that point, realized that she had been shot. Weatherspoon obtained aid from a neighbor, Desire Brown, and Brown's 15-year-old son, N.L. Brown. N.L. brought Weatherspoon into their home, where they called 911 and comforted her until an ambulance arrived. Weatherspoon and Burrell were both taken to Stroger hospital.

¶ 6     Weatherspoon testified that she remained in the hospital for three days, and, after leaving, she needed two to three months of physical therapy to help her learn how to walk again. When she returned to work, she had to limit her shifts to eight hours and had to sit down to rest because she could no longer stand for long periods of time. Weatherspoon also testified that she suffered "four to five miscarriages ever since [the shooting] happened."

¶ 7     Weatherspoon testified that the gunmen were "4 to 5 feet" from her when she observed them. Weatherspoon further testified that the area of the shooting was illuminated by streetlights and that both the Mitsubishi and the second car that pulled up behind the first had their headlights on. The first gunman that she looked at was the one standing closest to her. She described him as average height, with short hair and a light complexion, and he was holding a two-toned black and silver handgun with a "long clip." Weatherspoon identified defendant as this gunman in open court. Weatherspoon described the second gunman standing with defendant as tall, with long dreadlocks and a dark complexion. Weatherspoon identified codefendant as the second gunman, also in open court.

¶ 8     Weatherspoon testified that, while she was recovering in the hospital, she began receiving "get well soon" and "pray[er]" messages on her social media accounts. Weatherspoon then testified regarding three Twitter posts that she saw and took screenshots of in the days following the attack and that she later provided to the police to identify her attackers. Those three posts, and an additional post that was ultimately excluded, were the subject of a pretrial motion *in limine* by the State requesting that they be admitted. The four posts included two tweets comprised of text and emojis; a photograph of defendant, codefendant, and a third individual, with defendant holding a firearm; and a photograph of defendant individually, holding two firearms.

¶ 9     At the pretrial hearing on the State's motion, the State argued that the posts were relevant because (1) they allowed Weatherspoon to identify defendant and codefendant as her attackers and identify the firearm she believed was used in the attack, (2) they "corroborat[ed]" defendant and codefendant's "connection to each other," and (3) they were "circumstantial evidence of [their] involvement." The State argued, in sum, that the screenshots were "extremely probative" and that "any prejudice *** is not substantial enough to outweigh" their probative value.

¶ 10    The defense objected to the posts' introduction, arguing that they were more prejudicial than probative. The defense argued that there was no evidence regarding how the messages were sent or who sent them and that there was no "nexus to the defendants." Counsel also objected, based on the "best evidence rule," arguing that the defense did not have the opportunity to verify "anything with that telephone" or the "Twitter accounts."

¶ 11    The trial court "considered the arguments," concluding that three of the posts were admissible because Weatherspoon

> "identified the two defendants *** in this case through a photograph that she got through Twitter and that's how an identification was made, that is the biggest connection you could have to these defendants so I would find that it would be relevant for that reason. And how she got to that picture are those two prior tweets so she could certainly testify to the foundation and to those."

¶ 12    The court further reasoned that "any argument regarding who sent the tweets exactly would go to the weight not the admissibility." The fourth post—the photograph of defendant holding two guns—was excluded by the court, which noted that the gun Weatherspoon identified as being used in the attack was also displayed in the other photograph.

¶ 13    During Weatherspoon's trial testimony, she stated that, while still in the hospital, she received a request to follow her on Twitter from an account whose profile picture was a photograph of codefendant, whom she recognized as the second gunman. Weatherspoon testified that she clicked on the request and saw a recent tweet from the account that caught her attention because it referenced her nickname, "Quitta." The text of the tweet was "#NoNo yu Wnt RichGang or Quitta me," followed by several emojis including two thumbs down, "100," a painful face, a laughing face, a face with a surgical mask, a person running, and a gun aimed at that person. Weatherspoon agreed that the message was "not written in your normal English like you see in a book or magazine" but stated that she understood the message to mean that the sender was "laughing at the incident" and saying, "You [won't] catch me how we caught her." Weatherspoon took a screenshot of the tweet and saved it on her personal cell phone. Weatherspoon identified a physical copy of the screenshot, which was admitted into evidence and published.

¶ 14    Weatherspoon further testified that while looking at the Twitter account, she noticed a "re-tweet" of another message originating from a different account. Weatherspoon recognized the person depicted in the profile picture associated with that account as the first gunman. The text of the message read, "You ain't dead yet….. [devil emoji] but you can be boi [100 emoji]." Weatherspoon took a screenshot of this message as well, which she identified in court as a true and accurate depiction of the message. Weatherspoon testified that she understood this second message to mean that the sender "found out that we w[ere]n't dead," but "he is still going to try."

¶ 15    Weatherspoon testified that she then saw a third tweet, which contained a photograph of defendant and codefendant standing next to each other, with defendant holding a two-toned black and silver handgun with an extended clip. Weatherspoon recognized defendant and codefendant as her two attackers and recognized the gun as the one that was used by defendant during the

5

shooting. Like with the previous two posts, Weatherspoon took a screenshot and saved the post to her phone. Weatherspoon identified a physical copy of that screenshot as a true and accurate depiction of the post she observed.

¶ 16    Upon seeing the Twitter posts, Weatherspoon was "scared" and "felt like [she] was a target." She did not immediately inform the police about the posts.

¶ 17    Chicago Police Detective Terry Teahan testified that at approximately 10:45 p.m. on December 17, 2014, he and his partner, Detective Behrend, were assigned to respond to a shooting on the 5100 block of South Ada Street. They arrived at the scene shortly thereafter, where they spoke with responding officers, walked the scene with Evidence Technician Blaczerak, and canvassed the area for witnesses. Detective Teahan observed numerous shell casings, fired bullets, metal fragments from fired bullets, and a vehicle with blood stains and broken glass. The crime scene was photographed, and 28 fired cartridge casings were recovered.

¶ 18    Approximately 20 to 30 minutes after arriving on the scene, Detective Teahan spoke with N.L., who was 15 years old at the time, and his mother in their home on Ada. Detective Teahan learned from N.L. that N.L. had heard several gunshots coming from the street and immediately looked out the front room window. N.L. told Detective Teahan that he saw two male subjects shooting handguns. N.L. described one gunman as black, male, and 19-to-21 years of age, with a faded hairstyle and wearing a gray hooded sweatshirt with black pants. The other shooter was black, 19 to 20 years of age, with a dreadlock hairstyle, and wearing a black jacket with blue jeans.

¶ 19    After the shooting, N.L. saw the first shooter enter a gray car that was parked in the middle of the street. The second offender entered a black SUV that was parked in front of the gray car, and both vehicles then fled northbound from the scene. N.L. did not tell Detective Teahan that he

6

had been smoking marijuana, and it did not appear to Detective Teahan that N.L. was "under the influence of anything."

¶ 20    On the evening of December 29, 2014, 12 days after the shooting, Weatherspoon went to the Area Central 6 police station and provided detectives with the four Twitter posts. Detective Teahan asked her to email the screenshots to his department email. He then printed them out and inventoried them as evidence. Detective Teahan testified that, once he had obtained the screenshots in paper form, he did not take possession of Weatherspoon's phone because the phone itself did not have further evidentiary value.

¶ 21    A few hours after providing the police with the screenshots, Weatherspoon viewed two separate lineups. Weatherspoon identified codefendant in one lineup, and defendant in the other, as the shooters she observed on December 17, 2014.

¶ 22    Detective Teahan testified that he also placed a phone call to Burrell requesting that he come to view the lineups. Burrell, however, was uncooperative and refused to assist in the investigation.

¶ 23    The police then spoke to N.L. and his mother. N.L. agreed to view the two lineups, and both he and his mother signed a lineup advisory form. N.L. viewed the lineups, and his mother was not present in the room at that time. N.L. identified defendant as one of the people he saw outside the victims' vehicle, who fled from the scene of the shooting by getting into a waiting car. N.L. was not able to make an identification when he viewed the lineup containing codefendant. Detective Teahan further testified that N.L.'s mother was not asked to view the lineups because she had not been a witness to the shooting.

¶ 24    At approximately 12:46 a.m. on December 30, 2014, N.L. provided a written statement to an assistant State's attorney (ASA). N.L. signed each page of the statement and initialed

corrections. Attached to the statement were two photographs—one of N.L., taken as he was signing the statement, and the other of defendant, who N.L. confirmed was the person he saw on the night of the shooting.

¶ 25    At the time of trial, N.L. was 17 years old and was in the custody of the Illinois Youth Department of Corrections. N.L. had two juvenile adjudications, for residential burglary and aggravated unlawful use of a weapon. At trial, N.L. generally claimed to not remember "anything strange happen[ing]" on the night of the shooting because he had been "smokin' " that night. N.L. denied seeing the shooters, helping the female victim, or speaking to detectives on the night of the shooting. N.L. admitted that he was home that night but claimed that it was his mother who saw the shooters, who helped the female victim, and who was questioned by detectives after the shooting. N.L. also claimed that it was his mother, not N.L., who had given the handwritten statement at the police station in the presence of an ASA. N.L. admitted that he signed each page of the written statement but explained that he only did so because his mother "told the police officers [he] said the same thing she did, so they just made [him] sign off on it."

¶ 26    N.L.'s written statement was admitted as substantive evidence and published to the jury. In that statement, N.L. said that "on December 17, 2014, at approximately 8:50 p.m., he was at home when he heard approximately 20 to 30 gunshots outside his home." Upon hearing the gunshots, N.L. "immediately" ran to the front window facing Ada Street. He saw two vehicles stopped in the middle of the street directly in front of his home—a black Tahoe SUV and a silver four-door car behind the SUV. N.L. saw two black men standing outside by these vehicles. N.L. saw both men tucking objects into their pockets, but he could not see what these objects were. N.L. stated that the streetlights were on, and "he was clearly able to see both males." N.L. identified defendant as one of the men in a lineup and described the other as a "dark skinned male with

8

dreads." N.L. saw defendant get into the silver four-door car and saw the man with dreadlocks get into the black SUV, before both vehicles drove off. N.L. also saw a white car parked on Ada Street with a man and woman inside. The windows of the white car were broken, and the woman "was saying that she had been shot." N.L. called the police and helped the female, "who appeared to have been shot in the lower body." The male victim was bleeding from his head and arm. N.L. further stated that he was giving his statement freely and voluntarily and that he was not under the influence of drugs or alcohol.

¶ 27     On the second day of testimony, the State informed the court that it had learned that the defense intended to elicit testimony from one of the State's witnesses—Officer Patrick Fahey—concerning the recovery of a handgun during the arrest of defendant and codefendant. Outside the presence of the jury, the State made a motion *in limine* to bar this testimony as irrelevant. The State explained the evidence at issue:

"To put it in a little bit of context, there's going to be testimony from the Arresting Officer today, of the two Defendants, that happened 11 days after the incident here that we're on Trial for.

What happens in that case is, they see a vehicle with a bumper dragging on the bottom of a car. They attempt to do a traffic stop. The car flees. Then the two Defendants flee from inside the car and are placed into custody.

In the area of where the Defendants flee, in an alley, there is a gun found. Now, there will be no testimony from any Officers that they saw that gun in the hands of either of these Defendants.

The reason why that's important is, what happened three minutes before that traffic stop, is a murder, a currently CI [Continuing Investigation] murder, in

9

which these Defendants were initially placed under arrest, and released without charging for the time being.

Now, the facts of that murder, as they may become relevant to this Motion, are that there's a vehicle parked on the other side of the park, from where our shooting takes place.

There's a vehicle parked on the other side of that park. Two vehicles pulled up, and two people began shooting, and people are killed at that vehicle, and those two vehicles then [flee]. One of those vehicles is a silver sedan.

That happens just before the Defendants *** are seen in this car that's in that area, and the traffic stop is effected.

Now, in regards to the evidence of that, I tender the scene supps to Counsel; and they already knew about this case, anyway. There was no identifications made of these two Defendants. There was GSR found in the car that they were in.

Now, the State didn't seek to introduce all this stuff, because there was no ID of these Defendants. They weren't charged; and the case was a CI; and the fact that no one saw them holding that gun, there was not enough of a nexus, the State believed, to tie these Defendants to the gun.

And when the gun was sent out for ballistics testing, that gun matched shell casings from the scene of the murder, but not shell casings to the scene of our crime here.

So, to put that all in context, the State *** wasn't seeking to introduce that gun, because there wasn't a nexus to the Defendants, and because it wasn't relevant to the shell casings at the scene; and we were not going to introduce that evidence."

10

¶ 28    In response, the defense explained to the trial court that it was seeking admission of the evidence because the recovered handgun was relevant to their defense of misidentification. The recovered firearm was black and silver, like the gun described by Weatherspoon and depicted in the Twitter posts, but it had been "ballistically proved not to be *** the attempt murder weapon." The trial court ruled that, "if your clients agree that you want that in, that they get pulled over, they run, they get arrested, and Officers find a gun, and you want to make a point that that gun wasn't used in this shooting, I would allow that." The trial court added, "But I wouldn't allow [the prosecution] to bring in anything about the other shooting or the—you know, the other murder." The trial court then addressed defendant and codefendant:

> "THE COURT: Okay. Mr. Brown and Mr. Bell, you heard what Mr. Baliunas was arguing here, correct?
>
> CODEFENDANT: Yes.
>
> DEFENDANT: Yes.
>
> THE COURT: All right. You agree with that strategy, that that's what you want to do?
>
> CODEFENDANT: Yeah.
>
> DEFENDANT: Yeah.
>
> THE COURT: Okay. Very Good."

¶ 29    Thereafter, Chicago Police Officer Patrick Fahey testified that, on December 28, 2014, he was working with two other officers. They all were all in plain clothes, with ballistics vests and Chicago Police patches. At approximately 3:45 p.m., the officers were on patrol in an unmarked squad car in the area of 57th and Sangamon Streets—a little over a mile from the area of the shooting at 51st and Ada Streets—when they observed a gray four-door Chrysler 200 sedan with

11

its rear bumper dragging on the road. The officers attempted to conduct a traffic stop by activating their vehicle's lights and sirens, but the gray car sped up and attempted to drive away. The officers pursued for approximately one to two minutes, until the gray car stopped at 5740 South Peoria and four occupants fled from the car on foot. Officer Fahey identified defendant as the subject who fled from the driver's seat of the vehicle and codefendant as the subject who fled from the rear passenger seat.

¶ 30     Officer Fahey and his partners gave chase on foot. They lost sight of the subjects when they entered a gangway, but less than a minute later, assisting units apprehended two of the subjects—defendant and codefendant. Officer Fahey and the other officers searched the area and located a two-toned black and silver Smith & Wesson .40-caliber handgun in a nearby alley.

¶ 31     Forensic Scientist Brian Parr testified as an expert in firearms and toolmark identification. Parr was employed by the Illinois State Police, Joliet Forensic Science Laboratory. Parr testified that he received the 28 fired cartridge casings recovered from the scene of the shooting and opined that two weapons were used during the shooting. Parr determined that 15 of the fired cartridge casings were "Fiocchi 40 *** Smith & Wesson caliber" and were all fired from a single firearm; the remaining 13 fired cartridge casings were "Federal .9 millimeter Luger" and were all fired from a second firearm.

¶ 32     Parr also testified that he received and examined the handgun that was recovered at the time of defendant's arrest. Parr determined that the handgun had not discharged any of the recovered cartridge casings.

¶ 33     The State rested, and both defendant and codefendant chose not to testify or present evidence. The trial court questioned defendant and codefendant separately about their decisions not to testify. Defendant and codefendant both affirmed their decisions, with defendant specifically

indicating that he had discussed whether to testify with his attorney, that he understood that the decision was his and his alone, and that he affirmatively "d[id]n't want to testify."

¶ 34    After deliberations, the jury returned verdicts of guilty on all counts, convicting both defendant and codefendant of two counts of attempted first degree murder and two counts of aggravated battery with a firearm, additionally finding that they had both personally discharged firearms in the course of the attempted first degree murder offenses.

¶ 35    Defendant retained new counsel to present a motion for a new trial, in which he alleged that the trial court erred in admitting the Twitter posts and that trial counsel provided ineffective assistance. Defendant's claims of ineffective assistance included, among other things, challenges to trial counsel's (1) failure to move for a mistrial after codefendant's counsel commented during his opening statement that both defendant and codefendant would not testify; (2) failure to impeach Weatherspoon with prior statements and prove up the impeachment by calling witnesses to testify to those statements; (3) failure to object to Weatherspoon's testimony that she suffered miscarriages after the shooting; and (4) failure to object to the admission of the three Twitter screenshots. Defendant also challenged counsel's decision to present evidence regarding the gun found during defendant's arrest. Codefendant also hired a new attorney, who likewise moved for a new trial and raised claims of ineffective assistance of trial counsel.

¶ 36    The trial court held a joint hearing on the motions, at which defendant's trial counsel—Thomas Leinenweber—and codefendant's trial counsel—Algis Baliunas—testified.

¶ 37    Leinenweber testified that he and Baliunas worked collectively to prepare a joint defense. Leinenweber testified that defendant knew that he and Baliunas were working together and that defendant and codefendant's defenses were "intertwined." Leinenweber further stated that part of the defense strategy prior to trial was that defendant did not intend to testify. Defendant never

13

indicated to Leinenweber that he did not want him to discuss that strategy with codefendant's counsel.

¶ 38    Regarding not filing a motion for severance, Leinenweber testified that he did not believe there was a legal basis to sever because neither defendant nor codefendant had made statements to the police. Additionally, Leinenweber believed that it was in defendant's best interests to have the trials together because "two minds were better than one in the case."

¶ 39    On cross-examination, defense counsel questioned Leinenweber about his failure to seek severance based on the Twitter post allegedly made by codefendant. Leinenweber testified that he did not believe the Twitter post was an "admission" by codefendant because, per the trial court's ruling, it was admitted to explain how Weatherspoon made her identifications, not as "admissions of something that happened."

¶ 40    As for Baliunas's opening statement, forecasting for the jury that defendant and codefendant would not testify, Leinenweber testified that it was accurate that defendant was not planning to testify. When asked whether codefendant's counsel's statement "restricted [Leinenweber's] ability to defend the case in any way," Leinenweber answered, "Absolutely not." Leinenweber explained that defendant had the right to change his mind about testifying at any time and that the "strategy could always be changed depending on the circumstances." Leinenweber further testified that he continued to discuss with defendant whether he wanted to testify and confirmed defendant's decision prior to the defense's opportunity to call witnesses. At that time, defendant told Leinenweber that he did not want to testify and did not indicate that his decision was based on Baliunas's opening statement.

¶ 41    When questioned about defendant's allegations about Leinenweber's failure to impeach Weatherspoon or call potential impeachment witnesses, Leinenweber testified that he did not want

14

to "offend[ ] the jury" by "beat[ing] her up" to show that she had "somehow said something slightly different." Leinenweber explained that his strategy was to show that she had "made a mistake" and was "mistaken in her quick view of" defendant. Leinenweber believed that he "got that point across in terms of how quickly this happened, how scared she was, what the lighting situation was, et cetera." Overall, Leinenweber believed he "got what [he] wanted from Ms. Weatherspoon and [he] still th[ought] that was the best cross-examination."

¶ 42    Regarding Weatherspoon's testimony that she had suffered multiple miscarriages, Leinenweber reiterated that Weatherspoon was a sympathetic witness and that his argument to the jury was that she was a victim of a "terrible thing, *** it just wasn't [defendant] [who] did it." Based on that strategy, there was "no reason to question her honesty" about the effects of the shooting, "other than to enflame the jury" against his client and distract the jury from the defense's misidentification argument.

¶ 43    With regard to the decision to introduce evidence of the gun recovered at the time of defendant's arrest, Leinenweber testified that the evidence supported the defense of misidentification because the two-toned black and silver gun was similar to the gun that defendant was holding in the Twitter photo but did not match the cartridge casings at the scene of the offense. Additionally, once it was determined that the Twitter photos were "coming in," Leinenweber concluded that introducing the evidence outweighed potential prejudice, because "it was not going to be a surprise to the jury that [defendant and codefendant] handled guns previously." Leinenweber further stated that the evidence provided an alternative "explanation for [the] gun he's showing in the picture." Leinenweber testified that he discussed the strategy with defendant before the trial and defendant never indicated that he disagreed. Leinenweber told defendant that

it was "almost like ju-jitsu," a way to "use something that appears to be something bad for us and turn it into something good."

¶ 44    Baliunas, codefendant's trial counsel, testified, confirming that, prior to trial, he and Leinenweber jointly discussed trial strategy for both defendant and codefendant. Baliunas explained that the defense strategy was to hold the State to its burden of proof and that calling impeachment witnesses to present "mediocre impeachment" evidence would have undermined the strategy. Regarding the admission of the gun evidence, Baliunas believed the evidence "would be interesting for the jury to consider" and "was something in [the defense's] favor and at that point of the trial [Baliunas] felt that we needed that. We needed something."

¶ 45    After hearing arguments, the trial court denied defendant and codefendant's motions for a new trial. The court noted that this case "was an identification case. That was [the defense's] whole theory." The court agreed that "maybe there w[ere] certain things that were not done properly as far as proving up impeachment," but that nothing rose to the level of ineffective assistance. The court further commented that the impeachment "should have been better," but "impeachment is not properly done by many attorneys," even by those "who've practiced for 20 years."

¶ 46    The court specifically noted that the defense's strategy "was sound, was reasonable." The defense attorneys "were focused, there was a theory, they went through on their theory, *** they were passionate, and *** when you look at the evidence, it was the right theory. It's an identification case." Regarding the gun evidence, the court found that the defense "had a reason for" bringing that evidence in, and "it wasn't an unreasonable theory." The court also pointed out that it had questioned defendant and codefendant, and they both explicitly agreed with the strategy.

¶ 47    Finally, as to the evidence of the Twitter posts, the court stated:

"I allowed the tweets because *** that's how Miss Weatherspoon got to her identification. I find that extremely relevant for a victim to testify when she makes an identification before a lineup, that that's clear to the jurors how that lineup, not only how that lineup identification was made, but how this identification was made that led to these defendants. And I find that the jury—and the defense argued it as well, had to have a clear picture how she identified, she got this tweet, what it said, not for the truth of what was being asserted, not that the defendant did it, but what it said and why it led her to look at pictures and then she identified them. *** I find it completely relevant and appropriate for the jury to know exactly how this woman who is a single witness got to identifying the defendants. *** [I]t goes to her identification of defendant which was a central issue in this case."

¶ 48    At the subsequent sentencing hearing, the court noted that the relevant sentencing range for each of the two attempted murder convictions was 6 to 30 years and that each conviction required a 20-year enhancement based on the jury's finding that each defendant had personally discharged a firearm. The parties discussed that consecutive sentencing was triggered if the court made a finding of "severe bodily injury." The State argued that Weatherspoon's multiple gunshot wounds satisfied the requirement, while the defense asked the court to not make that finding because there "was no medical testimony" or "particular description of the wounds."

¶ 49    In aggravation, the State pointed out that defendant was on probation at the time of this offense, and went through defendant's criminal history, which included a juvenile adjudication for delivery of a controlled substance and an adult narcotics case that was reduced for defendant to receive probation. In mitigation, the defense pointed to six letters that were submitted on defendant's behalf, showing that he had "a strong family" and that he could "be rehabilitated" and

"turn himself around." The defense also emphasized that defendant had been 20 years old at the time of the crime and argued that even the mandatory minimum of 52 years, served at 85%, would "more or less" constitute a *de facto* life sentence. The defense asked the court to find that the minimum sentence was unconstitutional based on defendant's "youthful age." Defendant chose not to speak in allocution.

¶ 50    The court sentenced defendant to the mandatory minimum of 26 years in the Illinois Department of Corrections (6 years for the Class X conviction plus 20 years for personally discharging a firearm) on both counts of attempted first degree murder and found severe bodily injury to Weatherspoon, triggering mandatory consecutive sentencing, for a total of 52 years' imprisonment. The court acknowledged that the minimum was a "severe sentence" but expressed its belief that the sentence was not "unconstitutional."

¶ 51    Defendant filed a timely notice of appeal from that judgment and raises three general issues in this appeal—that the court erred in admitting the Twitter posts, that his trial counsel provided ineffective assistance, and that his 52-year sentence violated the proportionate penalty clause of the Illinois Constitution. We will address each of defendant's issues in turn.

¶ 52    We first consider defendant's challenge to the admission of the three Twitter posts. Defendant contends that the court abused its discretion in admitting the posts, contending they "lacked foundation and w[ere] unduly prejudicial."

¶ 53    "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The threshold for finding an abuse of discretion is high. A trial court will not be found to have abused its discretion with respect to an evidentiary ruling

unless it can be said that no reasonable person would take the view adopted by the court. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 54    "In general, the consequential steps of an investigation are relevant to explaining the State's case to a jury." *People v. Thompson*, 2014 IL App (5th) 120079, ¶ 46 (citing *People v. Johnson*, 116 Ill. 2d 13, 24 (1987)). "In particular, the State must be allowed to explain why a previously unidentified defendant became a suspect." *Id.* "Silence as to this point would leave open the question of why, of all the people in the world, the police arrested defendant." *Id.* "This would invite speculation and baseless innuendo that the investigation lacked rigor." *Id.*

¶ 55    As explained above, the record shows that shortly after the shooting, while Weatherspoon was still in the hospital, she received a request to follow her on Twitter from a previously unknown account. Weatherspoon observed four specific posts, of which she took screen shots—two posts comprised of text and emojis and two posts containing photographs. Weatherspoon recognized defendant and codefendant in the photographs as her shooters and also recognized the gun held by defendant in one of the photographs as "the gun that [she] was shot with."

¶ 56    In a pre-trial motion *in limine*, the State argued that it should be allowed to introduce all four Twitter posts into evidence because of their relevance to Weatherspoon's identifications, as "corroboration of these two defendants' connection to each other," and as "circumstantial evidence of their involvement." The defense pointed out that the State had not indicated that it would call "anyone from *** Twitter" to connect the posts to defendant or codefendant, and because there was no "nexus to" defendant or codefendant, "the prejudicial effect to the defendants greatly outweighs any probative value."

¶ 57    In this case, the trial court repeatedly stated that it was admitting the three Twitter posts because they were relevant to Weatherspoon's identification of defendant and codefendant. The

trial court agreed with the State that the post with the photograph was relevant and admissible because Weatherspoon "identified the two defendants *** through [that] photograph." The court also admitted the two posts containing text and emojis because those posts explained the circumstances of "how she got to that picture." The court, however, barred the screenshot of the fourth Twitter post, containing the photograph of defendant holding two guns because the gun Weatherspoon identified was also contained in the other photograph.

¶ 58    Later, at the hearing on defendant's motion for a new trial, the court further clarified that its decision was to admit the Twitter posts on the issue of identification, but it was "not allowing the State to go anywhere further *** as to who wrote them, how it was written or any of that." Defense counsel also testified to his understanding that the court admitted the screenshots to explain how Weatherspoon made her identifications and not as "admissions of something that happened."

¶ 59    Defendant insists that the trial court's ruling was an abuse of discretion because the screenshots lacked proper "foundation" to establish the "identity of th[e] account." Defendant's argument ignores that the screenshots were admitted into evidence, not for the truth of defendant and codefendant's ownership of the accounts or their authorship of the posts in question, but to show the circumstances of Weatherspoon's identifications of them as the shooters. For this purpose, her testimony that she took the screenshots at the relevant time and that they fairly and accurately depicted the Twitter posts that she observed was sufficient foundation for their admission. As the trial court stated,

> "I find that the foundation was laid by Miss Weatherspoon for these tweets. They were admitted because she's the one that took screen shots of them. She's the one that—it wasn't the [S]tate or the detective pulling up something on a tweet and then

going to her. It was [Weatherspoon] getting this evidence. She's the one that said, yes, this is what I did. And I found that that was appropriate, proper foundation. And that's why I let it in, because it goes to her identification of the defendants which was a central issue in this case."

¶ 60     We also note that Weatherspoon acknowledged during her testimony that she had "no idea who sent those tweets" and "no independent knowledge of whose accounts they were" or "who the phone numbers were registered to." The defense was also able to use the evidence of the Twitter posts to argue that Weatherspoon's identifications were suspect because the Twitter posts caused her to create "a memory in her mind," arguing that she recognized defendant and codefendant from the Twitter posts and not the actual shooting.

¶ 61     In this case, where the weight and believability of Weatherspoon's identifications was the central issue at trial, we find no abuse of discretion in the trial court's admission of the three Twitter posts for the purpose of explaining the circumstances of Weatherspoon's identifications.

¶ 62     We now turn to defendant's claims of ineffective assistance. Pursuant to *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant presenting a claim of ineffective assistance of counsel must allege facts sufficient to prove both (1) that counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Because both prongs of the *Strickland* analysis must be proven, if an ineffective-assistance claim fails under either prong, we need not determine whether the claim also fails under the other. See *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 63     The court gives a great amount of deference to counsel's judgment and indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional

21

assistance. *Strickland*, 466 U.S. at 689. "A defendant is entitled to competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of themselves, render the representation ineffective." *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. "The only exception to this rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *People v. West*, 187 Ill. 2d 418, 432-33 (1999) (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)). "A reviewing court evaluates the reasonableness of counsel's conduct from his [or her] perspective in light of the totality of the circumstances in the case." *Tucker*, 2017 IL App (5th) 130576, ¶ 54. Where, as here, the court reaches a determination on the merits of a defendant's ineffective assistance of counsel claim, we will reverse that determination only if it was manifestly erroneous. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Id.*

¶ 64 In arguing that his trial counsel provided ineffective assistance, defendant challenges several specific instances of counsel's alleged failures. We first consider defendant's claim that counsel's failure to seek a severance of his trial from that of codefendant amounted to ineffective assistance.

¶ 65 A defense decision not to seek a severance is generally considered trial strategy. *Id.* ¶ 24. Moreover, it is well established that "defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." *People v. Gabriel*, 398 Ill. App. 3d 332, 346 (2010).

¶ 66 "A defendant moving for severance must state how he would be prejudiced by a joint trial." *People v. McCann*, 348 Ill. App. 3d 328, 335 (2004). Our supreme court has recognized that at least two types of prejudice can be readily identified. *People v. Lee*, 87 Ill. 2d 182, 187

(1981). First, a defendant may be denied his constitutional right of confrontation if, in a joint trial, the State introduces the admission of a codefendant which implicates the defendant. *People v. Bean*, 109 Ill. 2d 80, 93 (1985); *Lee*, 87 Ill. 2d at 187. The second is when the codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others. *People v. Daugherty*, 102 Ill. 2d 533, 542 (1984).

¶ 67 Here, defendant makes no claim that his defense was in any way antagonistic to that of codefendant, and a review of the record would dispel any such notion. Both defendant and codefendant put forth the theories that Weatherspoon misidentified them and that the State did not prove their guilt beyond a reasonable doubt. In fact, counsel explicitly stated that he and counsel for defendant worked together and that their defenses were "intertwined."

¶ 68 Defendant instead alleges that the failure to seek a severance resulted in "the admission into evidence of statements allegedly made by codefendant on Twitter being used against defendant in the joint trial," relying on *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, a codefendant orally confessed that he and Bruton committed the offense of armed postal robbery. At their joint trial, the codefendant's confession was introduced into evidence. The trial court instructed the jury that the confession, which implicated Bruton in the crime, could only be considered as evidence against the codefendant and not Bruton. On appeal, the United States Supreme Court held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt, admission of [the codefendant's] confession in this joint trial violated [Bruton's] right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Id.* at 126.

¶ 69 As we explained above, the Twitter posts in this case were admitted, not as statements made by defendant or codefendant, but for their relevance to Weatherspoon's identifications of

23

them. Accordingly, the Twitter posts cannot be reasonably construed as "admission[s] of \*\*\* codefendant which implicate the defendant." Moreover, given the purpose for which the Twitter posts were admitted, the posts would have been equally admissible in a separate trial of defendant to explain how Weatherspoon identified him. We also note that trial counsel testified at the motion for a new trial regarding his belief that a joint trial was in defendant's best interests where counsel for both defendant and codefendant were able to work collaboratively.

¶ 70    Because defendant would not have been entitled to severance and because the record reveals a strategic reason why a joint trial was in defendant's best interests, defendant cannot show that trial counsel was deficient in failing to file a motion to sever his trial from that of codefendant. *People v. Bock*, 242 Ill. App. 3d 1056, 1080 (1993) ("[A]n attorney's failure to pursue a motion to sever cannot amount to ineffective assistance where, even if presented, the motion would have been unsuccessful.").

¶ 71    Defendant next contends that counsel provided ineffective assistance by failing to "object and request a mistrial" after codefendant's counsel "promised in his opening statement that the Defendant would not testify, and that 'the defense' would not call any witnesses." This claim is based on codefendant's counsel's opening statement, which reads, in relevant part:

> "[Defendant and codefendant] were pointed at by the prosecutors, 'These are the guys that did it.' Well, our defense is they are not the guys that did this horrible crime.
>
> The issue here is identification of the offenders. That's the only issue that you will have to deliberate on in this trial. \*\*\*
>
> They have to prove these two defendants were the people that did that. Our defense is they are not the people that committed this horrendous act. Period. And

24

*** you have also been instructed that these two young men are innocent until proven guilty. So anything that was said to you by the prosecution has to be proved and it can only be proved, only, from that witness stand—what you hear, see, and observe—from people that tell you what they know and what happened. That's it. Period. ***

Now, we indicated that the defendants may not testify, and you were instructed by the court and you all agreed that you would not hold it against [codefendant] and [defendant] if they fail to testify in this case. You promised, you made a solemn promise and an oath that you would do that. I'll tell you right now, they're not testifying. They don't have to testify. Okay? So let's get that out of the way.

The next thing: evidence. It is presented from that witness stand. Now how can it be presented? In different ways. Number one, we will not call—the defense— one witness. Zero. Period. None. Where will our evidence come from? Our evidence will also come from the witness stand in this case. *** [W]e will bring out facts on cross-examination that are favorable to our clients and negate any idea of guilt that these are the two individuals that perpetrated the serious, nefarious act. Somebody else out there did it, and that is our defense.

And I think when you hear the paucity of the State's case, *** the [witnesses'] ability to see and observe, *** at the end we will be asking for *** a not guilty verdict in this case. Thank you very much."

¶ 72    Defendant takes issue, in particular, with codefendant's counsel's statements: "I'll tell you right now, they're not testifying," and, "we will not call—the defense—one witness. Zero. Period.

None." Defendant argues that such statements were "promise[s]" to the jury, that were "premature" and "highly improper" because codefendant's counsel was "essentially making the decision [regarding whether] to testify for a defendant and doing so before any evidence has been presented" and because calling witnesses may become necessary based on the evidence presented. Defendant contends that, although it was not his own counsel who made the remarks, his counsel "should have immediately objected to these remarks and moved for a mistrial." Defendant further asserts that the comments reveal trial counsel's unauthorized disclosure of "privileged information."

¶ 73    Decisions regarding "what to object to and when to object" are matters of trial strategy and thus are entitled to great deference. *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997); *Graham*, 206 Ill. 2d at 478-79. "[S]ince an attorney's performance is ineffective only if it falls below an objective standard of reasonableness [citation], counsel cannot be deficient if he fails to object to remarks which are not improper." *People v. Johnson*, 218 Ill. 2d 125, 139 (2005) (citing *People v. Evans*, 209 Ill. 2d 194, 220 (2004)).

¶ 74    We find no deficient performance in counsel's failure to object and move for a mistrial based on codefendant's counsel's comments. At the hearing on defendant's motion for a new trial, defendant's counsel confirmed that, at the time codefendant's counsel made the statement, defendant did not intend to testify. In those circumstances, it was reasonable to forecast for the jury the defense strategy and remind them of both the State's burden to prove his guilt and the defense's concomitant right to not present any evidence, thereby ensuring that the jury did not place any improper expectations on the defense. This strategy was consistent with the defense theory of misidentification and the strategy of holding the prosecution to its burden.

¶ 75     We also reject defendant's argument that by "promising" that the defense would not present evidence, counsel allowed a "straitjacket" to be put on his ability to represent defendant, lest the jury be "put off by *** the defense not liv[ing] up to its promises." As counsel testified, the statement did not interfere with defendant's ability to exercise his right to testify, nor did it "restrict[ ]" counsel's ability to defend the case in any way. Trial counsel's testimony, as well as the record of the court's colloquy with defendant at the time he waived his right to testify, established that defendant knew that the decision to testify was defendant's and defendant's alone and that he affirmatively chose to waive that right because he "d[id]n't want to testify." Moreover, had defendant ultimately changed his mind and decided to testify, or had the defense ultimately decided to present evidence, then the defense would have exceeded the jury's expectations by presenting more than had been promised.

¶ 76     We also reject defendant's claim that codefendant's counsel's statements indicate that his counsel made an unauthorized disclosure of privileged information, specifically, defendant's decision regarding whether to testify. Counsel for defendant stated that he and codefendant's counsel worked collectively to prepare a joint defense and that defendant was aware that the attorneys were working together to present an "intertwined" defense. Leinenweber also testified that, prior to trial, defendant did not intend to testify and defendant never told counsel that he wanted that information kept secret from codefendant's counsel.

¶ 77     Having found no deficient performance, we need not reach defendant's arguments that he need not prove prejudice because counsel's failure constituted "a complete abandonment of his role as counsel" or, alternatively, that he was prejudiced by counsel's failure to object and move for a mistrial. *Graham*, 206 Ill. 2d at 476.

¶ 78    Defendant next claims that he "was denied his right to the effective assistance of counsel because his trial attorney failed to impeach [Weatherspoon] and *** prove up impeachment."

¶ 79    "Generally, the decision of whether or not to cross-examine or impeach a witness is a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel." *People v. Franklin*, 167 Ill. 2d 1, 22 (1995); *Tolefree*, 2011 IL App (1st) 100689, ¶ 34. "The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Pecoraro*, 175 Ill. 2d at 326-327. Defendant can only prevail on an ineffectiveness claim by showing that counsel's approach was objectively unreasonable. *Id.* at 327.

¶ 80    Defendant specifically points to Weatherspoon's statements to ambulance personnel on the night of the shooting, as well as interviews with responding officers and detectives at the hospital, to claim that her "account of the events was riddled with inconsistencies." Specifically, defendant contends that Weatherspoon told ambulance personnel that the shooters were 20 feet away, while at trial she testified that they were 4 or 5 feet away. Defendant further contends that in statements made to responding officers and to detectives at the hospital, Weatherspoon did not describe the shooters or describe them as specifically as she did at trial. Additionally, defendant states that in two of her three prior statements, Weatherspoon did not mention a second vehicle. Defendant contends that counsel should have impeached Weatherspoon with the prior statements, proving them up if necessary, and that doing so "would have devastated her testimony."

¶ 81    A review of the record shows that trial counsel effectively handled Weatherspoon's cross-examination, eliciting various admissions from Weatherspoon that were intended to call into question the reliability of her identifications. Specifically, counsel elicited that it was a "fairly dark" night, that she was looking at her phone, that the shooting started "immediately," that she

28

was scared, and that it was a "very chaotic and frightening event" that happened "instantaneous[ly]." Counsel also got Weatherspoon to admit that she initially said that she did not know how many shots were fired. Finally, counsel showed Weatherspoon a photo of the scene showing a street light and elicited testimony that that the street light would have been shining at the shooters' backs at the time of the shooting.

¶ 82 When specifically questioned about not pursuing or proving up certain points of impeachment, trial counsel explained his belief that "beating up" Weatherspoon on cross-examination would have hurt his client's case. He explained that any benefit from calling paramedics or responding officers to testify that she had "said something slightly different" would have been outweighed by those witnesses reminding the jury of the condition she was in and the injuries she had at the time the statements were made. In sum, counsel stated that he "got what [he] wanted from Ms. Weatherspoon and [he] still th[ought] that was the best cross-examination."

¶ 83 In these circumstances, we cannot say that counsel's approach was objectively unreasonable. See *People v. Holman*, 132 Ill. 2d 128, 163 (1989) (where proposed cross-examination concerned a "minor incident" in the case, "[e]xtensive cross-examination concerning, or objections to, the testimony could have called undue attention to the incident" and could also have turned the jury's sympathy against defendant if it appeared that counsel was picking on [the victim], a woman who had been shot, and whose son had been killed, by defendant").

¶ 84 Defendant, however, essentially argues that counsel's alleged "fail[ure] to properly follow the rules of evidence in proving up impeachment," was *per se* unreasonable, specifically focusing on the trial court's statement that counsel's impeachment "should have been better." Defendant contends that the court improperly excused counsel's clear deficiencies by commenting that "impeachment is not properly done by many attorneys."

¶ 85     We initially note that the court's comments on this point were in response to defense counsel's arguments that any "26-year-old third chair state's attorney, or *** 26-year-old second chair public defender" should know "correct trial practice."

¶ 86     Nonetheless, we reiterate that defendant is entitled to competent, but not perfect, representation. *Tucker*, 2017 IL App (5th) 130576, ¶ 26. Even if we could conclude that counsel made errors in his cross-examination of Weatherspoon, " '[m]istakes in trial strategy or tactics or in judgment do not of  themselves render the representation incompetent.' "  (Internal  quotation marks omitted.) *West*, 187 Ill. 2d at 432 (quoting *People v. Hillenbrand*, 121 Ill. 2d 537, 548 (1988)). While, in hindsight, defendant may contend that certain questions should have been asked or other tactics employed, we cannot say that counsel failed to conduct any meaningful adversarial testing sufficient to rise to the level of ineffective assistance of counsel.

¶ 87     Moreover, even if we were to find deficient performance based on counsel's choice to not impeach Weatherspoon regarding her prior descriptions, or lack thereof, of the shooters, defendant suffered no prejudice from that choice. The record shows that during codefendant counsel's cross-examination of Weatherspoon, he elicited testimony that during her initial interview, she "gave basically no description or no detailed description of the two people who shot [her]," other than that one of the suspects had dark skin. Accordingly, much of the testimony that defendant claims his counsel should have elicited, actually came into evidence and was before the jury.

¶ 88     Next, defendant asserts that his counsel was ineffective for failing to object to Weatherspoon's testimony "that she had suffered four or five miscarriages as a result of the shooting." This testimony was elicited after Weatherspoon was asked if she had "any other long lasting effects" from the shooting, and she responded, "I had four to five miscarriages ever since that happened." The answer was never elaborated upon or discussed during the rest of the trial.

¶ 89    Trial counsel's decision not to object to this testimony was reasonable in light of the defense theory. As stated above, the defense's strategy was not to deny the facts of the shooting or Weatherspoon's injuries. Instead, the defense acknowledged that "a terrible thing happened" to Weatherspoon, but argued that "it just wasn't [defendant] [who] did it." As counsel testified, "there was no reason to question [Weatherspoon's] honesty" about the effects of the shooting, "other than to enflame the jury" against defendant and distract the jury from the defense's misidentification argument. In denying defendant's motion for a new trial, the court found that there were "reasons why [the defense] didn't focus on that" and that counsel's failure to object to Weatherspoon's testimony on this point did not amount to ineffective assistance. We find no manifest error in the circuit court's findings.

¶ 90    Defendant next claims that his trial counsel was ineffective for failing to object when Weatherspoon testified concerning her understanding of the meaning of the Twitter posts depicted in the screenshots. Defendant argues that Weatherspoon should not have been permitted to testify regarding the meaning of the Twitter posts because she did not testify to any "specialized knowledge" allowing her to understand and interpret their meaning.

¶ 91    However, as described above, the posts were admitted to explain the circumstances of Weatherspoon's identifications, which include the effects that those posts had on Weatherspoon. Specifically, Weatherspoon testified that upon seeing the posts, she was "scared" and "felt like [she] was a target." As a result, she did not immediately alert the police about what she had found, but she took screenshots of the posts, which she saved on her phone. Twelve days after the shooting, after defendant and codefendant were arrested, Weatherspoon provided detectives with the screenshots and identified defendant and codefendant as the shooters in separate physical lineups.

31

¶ 92 Given the purpose for which the posts were admitted and the relevance of Weatherspoon's understanding of the posts, we find no ineffective assistance in counsel's failure to object to Weatherspoon's interpretation of the Twitter posts, where such an objection would have been meritless. *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless objection."); *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 95 (defense counsel is not required to make futile objections to provide effective assistance).

¶ 93 Defendant further claims ineffective assistance of counsel based on trial counsel's "fail[ure] to object to improper comments made by the prosecutor during closing argument."

¶ 94 A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). A closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context. *People v. Blue*, 189 Ill. 2d 99, 128 (2000). Statements will not be held improper if they were provoked or invited by defense counsel's argument. *People v. Kirchner*, 194 Ill. 2d 502, 553 (2000).

¶ 95 Defendant's first challenge is to certain comments regarding N.L. Looking at those comments in their context, the prosecutor stated, in relevant part:

"You also heard from [N.L.]. He was very uncomfortable on that witness stand. He didn't want to be here at all. He didn't want to be sitting in a room with these two guys. He didn't want to be telling you about anything that he saw that night.

And when it comes down to sitting on that witness stand, and facing people who have done something wrong, he doesn't have the courage for that."

¶ 96    In codefendant's counsel's closing argument, counsel argued that Weatherspoon's identifications were "uncorroborated," commenting, "I won't even address [N.L.] *** You saw him. You think he's afraid? No."

¶ 97    Then, during rebuttal, the prosecutor stated, "The fact that he got up here and didn't want to do that in open court, we're not saying it's because, oh, he's a little scared kid. He's obviously, not. It's because that's a violation. You don't come into court and make identifications." It is this comment by the prosecutor that defendant contends was improper and should have been objected to by his counsel. Specifically, defendant argues that N.L.

> "never testified or [alluded] to any fear of receiving such a violation. Instead, this
> was an argument that was made without evidentiary support in the record and was
> highly inflammatory and prejudicial since it gave the jury a reason to completely
> disregard his trial testimony, yet defense counsel made no objection."

¶ 98    The prosecutor's comment above was clearly provoked or invited by defense counsel's argument that N.L. was not "afraid." That argument caused the prosecutor to clarify that the State was not claiming that N.L. was "a little scared kid," but rather that N.L.'s trial testimony changed from the account provided by his statement because, "You don't come into court and make identifications." The prosecutor's comments were a reasonable inference supported by the evidence regarding N.L.'s written statement and the circumstances surrounding that statement, when compared to his subsequent trial testimony and recantation after multiple delinquency adjudications and while in the custody of the Illinois Youth Department of Corrections. Accordingly, counsel was not ineffective for failing to object to the prosecutor's comment, where the statement was not improper and an objection would have been meritless. *Edwards*, 195 Ill. 2d at 165; *Mister*, 2016 IL App (4th) 130180-B, ¶ 95.

¶ 99    Moreover, even if we could find any error in the prosecutor's comment, such error would have been cured by the trial court's subsequent instruction to the jury that "closing arguments are not evidence" and that the jury must decide the facts "only from the evidence in this case." See *People v. Desantiago*, 365 Ill. App. 3d 855, 866 (2006).

¶ 100    Defendant also challenges his counsel's failure to object to the following statement during the prosecutor's closing argument:

> "When [Weatherspoon] and [Burrell] were in that car, being shot by these Defendants, they were alone. As the bullets tore through them, and then as [Weatherspoon] the following day, starts getting these messages, threatening her from these Defendants she was alone. But here, today, in this courtroom, [Weatherspoon] is no longer alone. She has the evidence. She has the law, and most importantly, she has you."

¶ 101    Defendant contends that the above comments were an improper "attempt by the prosecutor to align Weatherspoon and the State with the jurors, and appeal to jurors' sympathies, rather than the facts and evidence."

¶ 102    Although closing arguments are improper if they serve no purpose other than to inflame the jury (*Blue*, 189 Ill. 2d at 128), a prosecutor may "comment unfavorably on the evil effects of the crime and urge the jury to administer the law without fear, when such argument is based upon competent and pertinent evidence" (*Nicholas*, 218 Ill. 2d at 121-22 (holding that the prosecutor's comments characterizing the defendant's actions as "pure evil" in order to preface his argument that the facts proved the defendant guilty "constituted a permissible comment upon the evidence")). "[L]imited prosecutorial exhortations are proper where it is made clear to the jury that its ability to effect general and specific deterrence is dependent solely upon its careful

consideration of the specific facts and issues before it." (Emphases omitted.) *People v. Johnson*, 208 Ill. 2d 53, 79 (2003). A prosecutor may not, however, "blur[ ] that distinction by an extended and general denunciation of society's ills and, in effect, challenge[ ] the jury to 'send a message' by its verdict." *Id.* In doing so, a prosecutor "does more than urge 'the fearless administration of justice,' he interjects matters that have no real bearing upon the case at hand, and he seeks to incite the jury to act out of undifferentiated passion and outrage, rather than reason and deliberation." *Id.*

¶ 103 Here, we find the prosecutor's statement to be a proper comment "urg[ing] the jury to administer the law without fear *** based upon competent and pertinent evidence." *Nicholas*, 218 Ill. 2d at 121-22. We do not find that the comments served no purpose other than to inflame the jury (*Blue*, 189 Ill. 2d at 128), nor do we find that they are "an extended and general denunciation of society's ills and, in effect, challeng[ing] the jury to 'send a message' by its verdict." *Johnson*, 208 Ill. 2d at 79.

¶ 104 Nonetheless, even if we were to find the prosecutor's comments improper, isolated references to the need to send a message or do something about the problem of crime do not ordinarily require reversal. It is only when such themes are argued pervasively that they become prejudicial enough to warrant reversal. See *id.* Given the isolated nature of the prosecutor's comments, in the context of the closing arguments as a whole, we find no reasonable probability that the outcome of the proceeding would have been different had defense counsel objected to the prosecutor's improper comments during closing arguments.

¶ 105 Defendant also argues that he "was denied his right to the effective assistance of counsel" by counsel's choice to introduce evidence of the gun found at the time of defendant's arrest. Defendant contends that by doing so, counsel "affirmatively presented harmful and damaging

other-crimes evidence, *** [which] allowed the prosecution to paint *** [d]efendant as a generally violent person, who was familiar with firearms."

¶ 106   As described above, at the time of defendant's arrest, police recovered a two-tone black and silver handgun that was consistent with Weatherspoon's description of the gun used by defendant in the shooting. That gun was forensically compared to the cartridge casings recovered from the scene of the shooting, and it was determined that it was not one of the guns used in that offense. At trial, Weatherspoon identified the gun being held by defendant in a photograph as the same gun defendant had used on the night of the shooting. The defense, however, attempted to undermine Weatherspoon's testimony by showing that the gun recovered at the time of defendant's arrest, which was also a two-tone black and silver handgun like the one that he held in the Twitter photograph, was not used in the offense.

¶ 107   Importantly, defendant explicitly consented to this strategy. When the defense requested that such evidence be introduced, the trial court addressed defendant and codefendant, who both confirmed that they "agree[d] with that strategy" and it was "what [they] want[ed] to do." Having given his express consent to the now complained-of strategy, defendant cannot now claim that the strategy amounted to ineffective assistance. "Where a defendant knowingly and intelligently consents to defense counsel's strategy, he normally cannot claim ineffective assistance of counsel for the actions of defense counsel in furtherance of that strategy." *People v. Anderson*, 272 Ill. App. 3d 566, 571 (1995) (citing *People v. Fair*, 159 Ill. 2d 51 (1994)); see also *People v. Page*, 155 Ill. 2d 232, 260-263 (1993).

¶ 108   Seeking to avoid that conclusion, defendant now argues that he should not be deemed to have given his consent because "it was not an informed [decision]" on his part, and it was "based on a misapprehension of the facts." Defendant further contends that he "was not notified of this

36

ill-informed decision until the day of the trial, only spoke about the topic for a few minutes with his attorney and he was apprehensive to question the professional judgment of his attorney." In support of the above claims, defendant cites only to his own affidavit attached to his motion for a new trial. That affidavit, however, is not consistent with his current characterization. Regarding the gun found at defendant's arrest, that affidavit states, in total,

> "At some point during the trial, [the trial] Court asked me whether I agreed with my attorney regarding the defense strategy about bringing up the incident when I was arrested with my co-defendant. *** I deferred to my attorney's decision on this matter, and this was never thoroughly discussed at the time I made this statement."

¶ 109   Furthermore, defendant's vague protestations are contradicted by counsel's testimony, in which he stated that he did discuss the strategy with defendant prior to the trial, and defendant agreed. The trial court was in the best position to evaluate defendant's claims and the circumstances of defendant's consent; it concluded that defendant knowingly and intelligently consented to the defense strategy. The court specifically found that defendant was "paying attention" and he "agreed because [the defense] attorneys had a reason for doing it." We find no manifest error in the court's findings. See *Fair*, 159 Ill. 2d at 79 ("We will not disturb the trial judge's ruling that defendant knowingly and intelligently consented to defense counsel's strategy in the case.").

¶ 110   Consent aside, defendant's claim of ineffective assistance also fails because trial counsel's strategy was reasonable and did not prejudice defendant. "[T]he choice of defense theory is ordinarily a matter of trial strategy, and counsel has the ultimate authority to decide this trial strategy. [Citation.] This court will generally not review a claim of ineffectiveness of counsel based on inadequate trial strategy." *People v. Guest*, 166 Ill. 2d 381, 394 (1995). An exception is "where

37

counsel entirely fails to conduct any meaningful adversarial testing." The fact that another attorney might have pursued a different strategy or that the strategy chosen by counsel ultimately proved unsuccessful, does not demonstrate incompetence or suggest ineffective representation. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002).

¶ 111 In the circumstances of this case, trial counsel's decision to introduce this evidence furthered a reasonable theory of misidentification. By introducing evidence of the recovered gun, which had been forensically proven not to have been used in the shooting, counsel attempted to discredit Weatherspoon's identification of the gun in the Twitter photograph that she testified was used in the shooting, thereby also calling into question her identification of defendant.

¶ 112 We also note that counsel testified that the decision to admit evidence of the gun found during defendant's arrest was made only after the court had already decided to admit the Twitter photo showing defendant holding a gun. As counsel explained in his testimony, any prejudice to defendant from the admission of the recovered firearm was lessened because defendant's familiarity with firearms was already suggested by the Twitter photograph and it "was not going to be a surprise to the jury" that defendant had handled a gun before.

¶ 113 Moreover, in admitting evidence of the gun, the court specified that defendant could enter the evidence in furtherance of his intended strategy; however, the court would not allow the State to enter any evidence regarding the double homicide that the gun was connected to, which also limited any prejudice to defendant from the gun's admission.

¶ 114 Finally, defendant claims that his trial counsel's errors cumulatively deprived him of a fair trial. However, we have already found that none of the circuit court's findings with regard to trial counsel's representation are manifestly erroneous. Where, as here, the alleged errors do not

amount to reversible error on any individual issues, there is no cumulative error. *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005).

¶ 115   Defendant's final challenge is to his sentence, arguing that it violates the proportionate penalties clause of the Illinois Constitution. The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

> "While courts of review are generally reluctant to override the judgment of the General Assembly with respect to criminal penalties [citation], it is also true that when defining crimes and their penalties, the legislature must consider the constitutional goals of restoring an offender to useful citizenship and of providing a penalty according to the seriousness of the offense [citation]." (Internal quotation marks omitted.) *People v. Miller*, 202 Ill. 2d 328, 338 (2002).
>
> "We have recognized three different forms of proportionality review. A statute may be deemed unconstitutionally disproportionate if (1) the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community; (2) similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly; or (3) identical offenses are given different sentences." *Id.*

¶ 116   Initially, we note that defendant's argument on this point is approximately one page long and that he does not argue under any particular theory of proportionality review. Defendant cites *People v. Buffer*, 2019 IL 122327, which held that a sentence over 40 years imposed on a juvenile offender constitutes a *de facto* life sentence. *Buffer*, however, does not apply to defendant, who

was 20 years old—not a juvenile—at the time of the offense. In anticipation of that conclusion, defendant relies on *People v. House*, 2019 IL App (1st) 110580-B, to contend that "at least one appellate court case in Illinois has applied the proportionate penalties clause to youthful offenders over the age of 18."

¶ 117   Defendant's vague challenge to his sentence, without identifying any particular theory for concluding that his sentence is unconstitutionally disproportionate, is not sufficient to allow for appellate review. See Ill. S. Ct. R. 341 (eff. May 25, 2018); *People v. O'Dette*, 2017 IL App (2d) 150884, ¶ 51 ("arguments not raised or not sufficiently developed are forfeited").

¶ 118   Defendant also did not specifically raise this issue in the trial court, making only a cursory argument that the court should find the minimum sentence unconstitutional based on defendant's "youthful age." Defendant did not present any evidence regarding the evolving science on juvenile maturity and brain development applied to him, and the trial court did not conduct an evidentiary hearing or make any findings of fact on defendant's specific circumstances. In these circumstances, the record is also not sufficiently developed to allow for appellate review. See *People v. Harris*, 2018 IL 121932, ¶¶ 41-46 (finding defendant's as-applied challenge was "premature" because "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court").

¶ 119   Apparently recognizing the insufficiency of the record, defendant alternatively asks in his reply brief that this court "remand this issue to the trial court for an evidentiary hearing to determine whether the science on juvenile maturity and brain development applied to the Defendant." Defendant acknowledges that the issue can be brought in a postconviction petition but claims that it would be "far more efficient for all parties involved to address this issue by conducting an evidentiary hearing on remand." We decline defendant's request. See *id.* ¶ 48

40

(declining the defendant's request for remand to the trial court for an evidentiary hearing on his proportionate penalties claim, finding that defendant's claim that his was more appropriately raised in another proceeding, such as a postconviction petition).

¶ 120   For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 121   Affirmed.

---

**No. 1-19-0366**

---

| | |
|---|---|
| **Cite as:** | *People v. Bell*, 2021 IL App (1st) 190366 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-12809; the Hon. Ursula Walowski, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Richard Dvorak and Loren Jones, of Dvorak Law Offices, LLC, of Willowbrook, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Daniel Piwowarczyk, and Megan K. Mulay, Assistant State's Attorneys, of counsel), for the People. |

---