2021 IL App (1st) 172418

FIRST DISTRICT
SIXTH DIVISION
December 3, 2021

No. 1-17-2418

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 10 CR 4562 |
| | ) | |
| RALPH LAYTON, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Ralph Layton was convicted of first degree murder and four counts of attempted first degree murder and sentenced to a total of 119 years' imprisonment. On appeal, defendant contends that trial counsel rendered ineffective assistance by not obtaining transcripts of an earlier trial to properly impeach a witness with his testimony that he did not see the shooters. He also contends that the court erred by not admitting evidence of a prior shooting involving defendant and the murder victim to establish that witnesses may have misidentified defendant as one of the shooters due to the prior incident. For the reasons stated below, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3    On June 19, 2017, a jury found defendant guilty of first degree murder and four counts of attempted first degree murder. The trial court sentenced him to 119 years' imprisonment on August 25, 2017, and he filed his notice of appeal on September 22, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI,

§ 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021) governing appeals from a final judgment of conviction in a criminal case.

¶ 4                                    II. BACKGROUND

¶ 5     Defendant was charged with the first degree murder of Cortez Moutry and the attempted first degree murders of Byron Nelson, Jonathan McClain, Brendan Collins, and Marques Elder, all allegedly committed while defendant was armed with a firearm on or about November 22, 2009.

¶ 6                                    A. First Trial

¶ 7     Defendant had a jury trial in March 2017, but the court declared a mistrial when that jury could not reach a unanimous verdict. We shall describe the relevant portions of this first trial.

¶ 8     The State's opening statement mentioned "history that goes back some time" between defendant and Moutry.

¶ 9     During cross-examination of Nelson, the defense sought to elicit testimony concerning an incident about a month prior to November 22, 2009. However, the court sustained the State's objection that this was beyond the scope of direct examination. Nelson testified to not knowing of any issues between Moutry and defendant. When the defense asked if Nelson had ever seen Moutry shoot at defendant, Nelson replied "No" before the State's objection was sustained.

¶ 10    Collins testified that he did not see who shot at him, Moutry, Nelson, Elder, and McClain, as they were exiting a nightclub together on the early morning of November 22, 2009, nor did he recall seeing a car near his parked car just before the shooting. He did notice defendant inside the nightclub earlier that night. When confronted with a February 2010 statement that he saw a blue Chevrolet Impala near his car and saw defendant leap from it with a gun in hand and shoot at the group, he testified that he did not remember saying what was in the statement. He also did not

recall his grand jury testimony to seeing a blue Impala and defendant holding and firing a gun. He did recall hearing multiple gunshots, being shot in his right leg and one of his left fingers, fleeing, and returning several minutes later to see that McClain had apparently been shot.

¶ 11 Carmen Arrington (Carmen) testified to being a friend of defendant and owner of a blue Impala, which defendant drove on the early morning of November 22, 2009. During direct examination, she identified her Impala from police photographs in part by bullet damage to the Impala that had occurred about a month before the night in question. During cross-examination, the defense sought to ask Carmen how that bullet damage occurred, arguing that the State had opened the door with its examination and the reference in its opening statement to a "beef" between defendant and Moutry. The State objected that this would be irrelevant and "beyond the scope," as defendant was not raising self-defense. The defense replied that the evidence was relevant to show why defendant's name would arise in the questioning of witnesses and to impeach Nelson. The court ruled that the defense was "not going to get into the fact that there may have been an argument and a shooting between the defendant and the victim prior to that date, not this way."

¶ 12 After argument during the defense case, the court reconsidered its ruling insofar as it admitted Carmen's account of the earlier shooting to impeach Nelson. The parties stipulated that Carmen would testify that, about a month before Moutry was shot, she and defendant were in her blue Impala with defendant in the driver's seat when Moutry shot at the car as Nelson was present.

¶ 13 When the defense requested reimbursement of an expense during trial, the court denied it, finding that defendant was not indigent because he had private counsel. Counsel argued that he took the case "essentially *pro bono*," but the court reiterated that defendant was not indigent.

¶ 14                             B. Motions *In Limine*

¶ 15    During motions *in limine* for the June 2017 retrial, defendant moved to introduce evidence

of the prior shooting involving defendant and Moutry. The defense reminded the court that it had

excluded the evidence as irrelevant in the first trial, and the court initially denied defendant's

motion. However, the court then recalled that it allowed the evidence for the purpose of

impeaching Nelson "because the door was opened during the trial" and followed its earlier ruling.

¶ 16                         C. This Trial – State's Evidence

¶ 17                                 1. McClain

¶ 18    McClain testified that, in November 2009, he had known Moutry since they were both

children and saw him nearly every day, and he was acquainted with Nelson, Collins, and Elder.

For at least a few years, he knew defendant and a man named K.T., identifying the former at trial.

McClain had been to "Mr. Ricky's" nightclub a few times and identified photographs of the

vicinity of Mr. Ricky's. As of trial, McClain was on parole for a 2016 weapons conviction and had

a controlled substance conviction from 2007.

¶ 19    When asked if he remembered going to a celebration at Mr. Ricky's with the aforesaid men

around November 22, 2009, McClain could not remember. He identified a photograph of his

cousin's car but denied remembering if he drove that car to Mr. Ricky's with the group on

November 22, 2009. He denied remembering that, as they left Mr. Ricky's on that night, he saw a

blue Impala next to his cousin's car, then saw defendant and K.T. exit the Impala with guns in

hand, heard defendant make a remark to Moutry, and saw defendant and K.T. shoot at them. He

did not remember being shot in the arm and back, treated by paramedics, brought to the hospital,

or visited by police in the hospital on November 22, 2009.

¶ 20    McClain denied remembering being interviewed or shown two photographic arrays by police on November 23, 2009, after he left the hospital. However, he acknowledged that an advisory form bore his signature, at trial he identified defendant from one array and K.T. from the other, and the photographs of defendant and K.T. in the arrays were already circled and bore the date "11/23/09" and his signatures. McClain also did not remember viewing a lineup in February 2010 but acknowledged that another advisory form bore his signature and at trial identified defendant from a photograph of the lineup. He did not remember why he had identified defendant and K.T. on either of those occasions.

¶ 21    McClain recognized a December 2009 statement that he signed, including attached photographs of defendant and K.T. upon which he acknowledged having written "Ralph" and "KT" respectively. He could not remember who he gave statement to, whether he had an opportunity to review the statement before he signed it, or whether he read the statement aloud before signing. He acknowledged that the statement had apparent corrections that bore his initials. While he did not remember giving the statement, he admitted that it correctly gave his birthdate and his age at the time, 28 years, and correctly stated that Moutry was his friend for years.

¶ 22    McClain's statement said that he was an acquaintance of defendant and K.T. McClain went to Mr. Ricky's on November 22, 2009, to celebrate the birthdays of Moutry, Collins, and McClain's cousin Richard Moore, along with Elder, Nelson, and Jerome Edmonds. None of them were armed. At some point while at Mr. Ricky's, defendant walked past the group as Moutry said "what's up?" and made a "funny" smile to defendant. When they left Mr. Ricky's at about 2:45 a.m., Moore and Edmonds went towards one parking lot while McClain, Moutry, Collins, Elder, and Nelson went to another to go home in Moore's car. Next to Moore's Lincoln, McClain saw a

blue Impala with defendant in the driver's seat and K.T. in the passenger seat. In the statement, defendant identified photographs of defendant and K.T. Defendant and K.T. exited the Impala with guns in hand, and defendant said to Moutry "That s*** ain't funny now" before shooting Moutry multiple times in the chest and stomach. K.T. also fired multiple shots, striking McClain and Collins as they tried to flee. Defendant's gun was a black .40-caliber semiautomatic with an extended clip, and K.T. had a black 9-millimeter handgun. McClain also described the clothing defendant and K.T. were wearing that night. McClain was still hearing gunshots as the police arrived. At trial, McClain testified to not remembering any of the aforesaid.

¶ 23    On cross-examination, McClain testified that he was subpoenaed to testify. He had discussed the case with the defense before trial but never discussed it with defendant himself. He was not afraid of defendant. His codefendants in his weapons case included Nelson. The statement he signed was not written or typed by him, and he could not recall who wrote it. He could not remember being asked to read the statement on direct examination or ever, and he reiterated that he did not recall giving the statement or any other statement to police.

¶ 24                                    2. Nelson

¶ 25    Nelson testified that, in 2009, he was a long-time friend of Moutry and would see him every day. He also knew defendant from the neighborhood for a few years, and he identified defendant at trial. There were times when he was with Moutry when defendant was also present, but Moutry and defendant were never together.

¶ 26    On the night of November 21, 2009, Nelson was with Moutry for his birthday, and they went to Mr. Ricky's along with their friends Elder, Collins, and McClain. They went to the nightclub in a Lincoln and parked across the street. At trial, Nelson identified a photograph of the

Lincoln they used to get to Mr. Ricky's. Once inside, Nelson drank vodka and champagne, and his friends also drank. He could not recall if he was with his friends constantly that night. Nelson never interacted with or even saw defendant inside Mr. Ricky's. Nelson and his friends left Mr. Ricky's at about 3 a.m., crossing the street to return to their parked car. However, two men jumped out of a blue Impala near their car, a photograph of which Nelson identified at trial. Nelson recognized one man as defendant but did not recognize the other. Defendant said something, but Nelson could not tell what. Defendant had a gun in his hand, which Nelson could not describe, pointed at him and his friends. Defendant fired several shots at the group as they all stood near each other, and Nelson was struck five times, including three times in the legs and twice in the stomach. He was unable to flee, and he saw Elder next to him on the ground, apparently also wounded. Nelson did not see where defendant went, and he was on the ground until the paramedics assisted him. He could not recall if he talked to the paramedics or police at the scene. He was taken to the hospital and was there for two or three days. He was not carrying a gun on the night of the shooting, nor did he see Moutry or his other friends carrying a gun that night.

¶ 27    When shown a still picture from Mr. Ricky's security video, Nelson testified that it showed himself, Moutry, and other friends exiting the nightclub on the early morning in question, although he left at about 2:41 a.m. while the image's timestamp was 3:14 a.m. When shown another such still picture, he was asked who the person in the white hat and jacket was, but he did not know.

¶ 28    Nelson did not recall if he spoke to detectives on November 27 after he left the hospital but recalled viewing a photographic array and recognized an advisory form bearing his signature. He had identified defendant as a shooter from the night in question by circling his photograph and signing it, and he testified that defendant at trial was the same man as in the array. He could not

recall if he was shown a lineup in February 2010 but recalled being shown a lineup in which he identified defendant as the shooter. At trial, he identified a photograph of that lineup. As of trial, Nelson had a pending case for armed violence and prior convictions for a weapons offense and a controlled substances offense. He denied being made any promises regarding any of his cases in exchange for his trial testimony. He acknowledged having failed to appear on a subpoena earlier in this case and having been arrested and then released on bond, and he denied that he was made any promise in exchange for releasing him on bond.

¶ 29 On cross-examination, Nelson testified that he could not recall when Mr. Ricky's closed. He did not see defendant on the night in question until he exited the Impala. He could not recall what the lighting in the parking lot was like that night. He did not remember saying anything to Elder nor making a call as they lay wounded after the shooting, and he specifically denied calling his girlfriend from Elder's cell phone. He did not see when anyone else was shot. He did not dislike defendant, but they did not attend parties together. He discussed the shooting with the other victims frequently in 2009 and 2010 but did not discuss it with them the next day, as he was in the hospital, nor right after leaving the hospital. He could not recall when he first discussed the incident with them, except than none of them visited him in the hospital while he was conscious.

¶ 30 Nelson was interviewed by police in November 2009, telling them that defendant and K.T. were in the blue Impala and jumped out of it, then defendant said something that Nelson did not hear. He did not recall telling police that he saw defendant and K.T. leave in the Impala after the shooting, nor did he recall whether he named K.T. as one of the shooters. When asked at trial if he had seen defendant leave the scene after the shooting, Nelson testified "He drove off in the car." When counsel noted that he had testified to not seeing defendant leave, Nelson replied "I thought

you meant the club." He did not know if he said in the November 2009 interview that defendant had no motive for shooting Moutry, but at trial he testified to being unaware of any motive.

¶ 31    Nelson admitted that he discussed the incident with his friends before his February 2010 grand jury testimony. He testified to the grand jury that defendant said "S*** ain't funny now" before shooting. When asked how he could not recall in November 2009, the month of the incident, what defendant said but then recalled it months later, he said "I don't know." He testified at trial "I don't know what [defendant] said. He said something." He did not recall testifying before the grand jury that he and his friends were together the whole time they were at Mr. Ricky's, and he did not remember at trial whether they were together all the time. He acknowledged his grand jury testimony that he and his friends arrived at Mr. Ricky's about midnight, stayed together "the whole time" until leaving at nearly 3 a.m., and left together. He did not remember testifying to the grand jury that he saw defendant and K.T. exit the Impala or that he had identified K.T. from a photographic array in December 2009. Nelson was not shot in the back, and he did not remember testifying or indicating to the grand jury that one of his injuries was to his back. He explained that the bullet exited his back and denied that any of the bullets exited the front of his body. He was not fleeing when he was shot in the back because he had no opportunity to flee.

¶ 32                                    3. Collins

¶ 33    Collins testified that he knew Moutry for many years and also knew defendant, identifying the latter at trial. On the night of November 21, 2009, Collins and Moutry were going to Mr. Ricky's for their birthdays with friends McClain, Nelson, and Elder. Collins drove to the nightclub by himself and met the others, who had been driven by McClain in a Lincoln. Collins drank champagne at the nightclub and saw his friends drinking. The group did not stay together

constantly as they went to smoke. They were at Mr. Ricky's for a few hours, and at about 1 a.m., as Collins smoked, he saw defendant smoking "in the back" smoking area. Collins did not speak to defendant, and they had no argument. Collins and his friends left when the nightclub closed, about 2:30 a.m., and Collins decided to ride with the others. They crossed the street to get to the Lincoln. Before they reached it, defendant leapt from a blue Impala near the Lincoln, with a gun pointed at Moutry, and said "Laugh now" before firing. Collins "took off." He had seen another man in the Impala before the shots but did not know who he was. Collins did not see anything after the first shot as he took cover behind a nearby building, but he heard more shots as he ran. He was shot in the right leg and left finger as he fled. He saw that McClain had been shot in the right arm. Collins was eventually taken to a hospital where he stayed for a few days. The bullet in his leg was not removed, as it was too close to an artery, and he still had scars as of trial.

¶ 34     Collins could not recall being visited in the hospital on the day of the shooting by police with a photographic array. However, he recognized an advisory form with his signature and recalled being shown an array. He had identified defendant's photograph from the array by circling and signing it with the date November 22, 2009, and he indicated at that time that defendant shot Moutry. Collins remembered viewing a lineup but could not recall if that was in February 2010. "[E]verybody that got shot probably" was in the room, but they were shown the lineup separately. Collins recognized the lineup advisory form with his signature and dated February 6, 2010. He had viewed the lineup after signing the form, recognized a photograph at trial as depicting the lineup, and testified that he had identified defendant in the lineup as the man who shot Moutry. Collins had convictions for controlled substance offenses. He denied being made threats or promises for

his testimony. He was arrested for not appearing on a subpoena in this case and was released on bond, and he denied that he was made any promises in exchange for his release on bond.

¶ 35     On cross-examination, Collins testified that he was subpoenaed more than once in this case and, when he did not appear and an arrest warrant was issued for him, turned himself in rather than being arrested. Collins recalled testifying in March 2017 but denied testifying that he drank a lot on the night in question. When asked if he testified to hearing a shot and fleeing without seeing who fired the shot, he replied "Correct," but the State objected on foundation grounds.

¶ 36     In the sidebar conference, the court expressed concern that the jury would realize defendant had been tried previously. When the defense noted that it could use copies of the trial transcripts if the State provided them as the defense could not afford its own copies, the court referred to that as "another problem" and the State argued that the defense could not impeach Collins without transcripts. The defense argued that it could impeach Collins by asking him if he had testified in a certain manner, and it reiterated its request for copies of the transcripts. The court stated that the defense was not entitled to free transcripts because defendant had private counsel, and it ruled "[i]f you don't have any transcripts and you can't lay a proper foundation because there are no transcripts, then I'm going to sustain their objection." The defense noted that it asked Collins if he had testified in a certain manner, but the State argued "if he says no, how are you going to impeach him if you don't have the transcript." The State argued that a transcript was necessary to perfect impeachment while the defense argued it was not required. When the court asked how the defense would perfect impeachment, counsel replied that funds would have to be collected from defendant's family and friends to buy a copy of the transcripts of the first trial. Otherwise, if Collins denied testifying in a certain manner, "I can't proceed with the question and answer, I understand

that." The court noted that it would take time to prepare transcripts and stated that it would not continue the case for days. The court said that the defense was not prepared for trial but counsel maintained that he was ready. The court overruled the objection.

¶ 37    Collins was asked if he testified that "somebody came up to you, you heard a shot, and you took off, and that you did not see anyone shooting at you," but he denied it. He admitted that he could not recall who shot at him, but "I didn't ever say me" but instead had testified as to who shot Moutry. When asked if he could not recall in March 2017 who shot Moutry, Collins replied that he could not remember. The defense tried to elicit that, because Collins could not identify the shooter in his March 2017 testimony, the State had to confront him in March with his earlier statement. The State's foundational objection to that line of questioning was at first sustained. When counsel rephrased the question, Collins admitted that the State confronted him in March with his earlier statement. When asked if he had testified that he did not see defendant on the night in question, Collins replied that he testified to seeing defendant in the nightclub. He acknowledged testifying in March that he did not recall seeing defendant outside the nightclub. He denied being asked in March whether he saw anyone exiting a blue Impala on the night in question but admitted that he "didn't remember seeing anybody jump out of a blue Impala."

¶ 38    While Collins and his friends were drinking at the nightclub, he did not agree with the characterization that they drank "a lot." He did not see defendant have a confrontation with Moutry or any of his friends inside the nightclub. Collins drove to the nightclub by himself but left with McClain and the others, intending to leave his car there. As they walked to the car, McClain was in front, then Collins, followed by Moutry, Nelson, and Elder. They were only a few feet from their car and each other when the incident began. Collins saw one gun that night, a black gun that

was "[p]robably" a semiautomatic. Moutry was shot first, but Collins did not know who was shot next as he fled immediately. He admitted to being reluctant to discuss the details of his shooting when he arrived at the hospital. He had spoken with McClain, Nelson, and Elder since the incident but could not recall them discussing the incident. He did not witness anyone else viewing the lineup, and he could not recall in what order the men viewed the lineup.

¶ 39                                    4. Elder

¶ 40     Elder testified that Nelson was his cousin and he knew Moutry, McClain, and Collins for years. On the night of November 21, 2009, they went to Mr. Ricky's to celebrate Moutry's birthday. Elder could not recall who drove there. He was drinking and saw his friends drinking, and they were socializing with others in the nightclub. He saw defendant, who he knew from the neighborhood, in the nightclub that night. He identified defendant at trial. Elder did not interact with defendant nor see any of his friends do so. Elder and his friends were in the nightclub for several hours until it closed, and he left with them. He did not recall crossing the street on the way to the car. They walked to the car in a group with Elder towards the back. When Elder heard gunshots in front of his group, he started to run the other way and did not see who was shooting. He was struck by three bullets in the shoulder, back, and neck and fell to the ground. Nelson was sitting on the ground and said he was getting weaker, and Moutry was lying on the ground. Security and paramedics arrived a short time later, and Elder was brought to a hospital. Neither Elder nor any of his friends had a gun. Elder had been subpoenaed to testify earlier in the case, and an arrest warrant was issued when he did not attend, but he surrendered himself and was released on bond.

¶ 41     On cross-examination, Elder testified that he did not recall any difficulty between defendant and his friends. A detective interviewed Elder in the hospital on the day of the shooting,

but he could not recall what the detective asked or how he replied. He denied that he would have told the detective that he did not know anyone named Ralph. He did recall being shown a photographic array and not identifying anyone in it. He was unaware of any problems between any of his friends and anyone in the nightclub. It was "a little dark" in the parking lot at the time of the shooting. He did not remember hearing a remark before the gunshots. After Elder was shot, Nelson asked to borrow his cell phone, but he could not pass or throw it to Nelson.

¶ 42                                    5. Carmen

¶ 43    Carmen testified that she was a long-time friend of defendant and her cousin Akhenaton "K.T." Arrington was his best friend.[1] Carmen owned a blue Impala in November 2009 and defendant had access to it. On the night of November 21, she was going to Mr. Ricky's, owned by her godfather, where she was a supervisor. Mr. Ricky's closed at 3 a.m., and the last call for alcohol was 2:30 a.m. On that night, she was going as a customer. Defendant drove her to Mr. Ricky's in her Impala, and she saw him again briefly as he walked past her in the nightclub not long after she arrived. She was drinking that night and stayed at the nightclub until after it closed. When she decided to leave, she phoned defendant but could not speak with him, as she repeatedly yelled at him and he repeatedly hung up. "He just was trying to get me off the phone." She had a friend drive her home. As she was walking to her friend's car a couple of blocks away, she heard gunshots "in the distance." There were several bars in the area and "hundreds of people" in the parking lots.

¶ 44    When she confronted defendant later about not taking her home, he was apologetic. She accused him of ruining her life, to which he replied that he did not mean to ruin her life, but he did not say he "f*** up." She testified before the grand jury in December 2009 that he repeatedly said

---

[1]We shall refer to Akhenaton Arrington as K.T. for clarity and consistency with the testimony.

he "f*** up" and "shouldn't have done that." When asked why she testified so, she said that she had been told to "just say it like that." When asked if she had testified before the grand jury that defendant apologized for ruining her life, she replied that she did not recall. Carmen had a case of driving under the influence pending at the time of trial but denied that she had been made any threats or promises to induce her testimony.

¶ 45 Carmen identified a photograph of her blue Impala as accurately depicting it in 2009. The defense objected that since "[t]here's not any testimony going to this jury with respect to my client being shot in this car a few weeks prior," it would be prejudicial for the jury to see photographs of the Impala's bullet holes absent an explanation. The State argued that it would elicit from Carmen that the bullet holes were there before the night in question, but the defense argued that was insufficient "because you're not explaining it." When counsel asked the court if it was "precluding me from asking the question if there's bullet holes in the car?" when bullet holes were visible, the court replied that they were not visible as they "could be a scratch" and told counsel "Don't ask about bullet holes." The court did exclude a closeup photograph of bullet holes.

¶ 46 On cross-examination, Carmen reiterated that defendant dropped her off at Mr. Ricky's, that she saw him again in the nightclub a short time later while it was still Saturday, November 21, and that she did not see him again on the early morning of November 22. When asked if she had testified to the grand jury that she feared for the safety of herself and her children, she admitted being "afraid of the people" who were "standing outside like a block or so down" including "John B. [and] Byron." She described them as "a little group" who "used to run around and cause a lot of mayhem."

¶ 47 On redirect examination, Carmen testified that she did not associate with the group she was afraid of but "just knew their faces." She did not see Nelson that night.

¶ 48                                    6. Prior Statements and Identifications

¶ 49 Paramedic Edward Kwiatkowski testified that he and another paramedic responded to a call at about 3:10 a.m. on the night in question and found three gunshot victims at the scene. Nelson was severely injured and required immediate hospitalization, as did another victim nearby, while the third was dead. Nelson was alert and oriented despite multiple gunshot wounds. Kwiatkowski treated Nelson as he was taken to the hospital, and he said that Ralph in a blue car shot him. When asked if he knew Ralph, Nelson gestured affirmatively. He seemed scared and repeatedly asked if he was going to die. Nobody else was with Nelson when he made these responses, as the other paramedic was driving the ambulance. Kwiatkowski passed on Nelson's information to the owner of the ambulance company, who was also a detective. However, Kwiatkowski did not include it in his initial report because it did not concern his care of Nelson. His report mentioned "[p]robable recent *** alcohol use." He later issued a supplemental report including Nelson's information.

¶ 50 Ramiro Montes of the Illinois State Police testified to visiting Collins in the hospital on the day of the shooting. Montes presented Collins with an array of six photographs after providing him an advisory form, which he signed, stating that he need not make an identification, the suspect may not be included, and he should not assume that Montes knew who was the suspect. Collins identified a photograph of defendant as the man who shot Moutry.

¶ 51 Montes also interviewed McClain in the hospital on the day of the shooting, and he told Montes that "Ralph and K.T. shot us." Montes interviewed McClain again the next day after he

left the hospital. Montes showed him two photographic arrays after providing an advisory form that he signed. McClain then identified defendant from one array and K.T. from the other.

¶ 52     Detective Darryl Hope testified that, when he arrived at the scene, paramedics and other police were already there and three victims—Moutry, Collins, and Nelson—were still there. After learning that Moutry had died, he began a death investigation, including canvassing the area for video evidence. Mr. Ricky's had video, but it did not cover the parking lot where the shooting occurred, and no other useable video was found. Based on the investigation, Hope was seeking a blue Impala. When he learned that Nelson was to be released from the hospital on November 27, 2009, he brought a photographic array and advisory form to the home where Nelson was staying. After Hope presented and read him the form and he signed it, Nelson viewed the array and identified defendant's photograph as the man who shot him. The blue Impala was found in December 2009 and brought to the police station to be examined.

¶ 53     Defendant was arrested in February 2010, and Hope conducted lineups. McClain, Nelson, and Collins were kept separate until after they each viewed the lineup. However, Collins and Nelson came to the police station together. McClain, Nelson, and Collins were each shown, read, and signed an advisory form, viewed the lineup, and identified defendant as one of the shooters.

¶ 54     On cross-examination, Hope testified that he interviewed Collins in the hospital on the day of the shooting and he made no identification. Collins heard someone say something—possibly "Laugh now?"—but did not see who said it, as he was in distress. When Hope arrived at the scene, Moutry, Nelson, and Elder were nearby in the parking lot, while Collins and McClain were near a building. McClain was not called to view the lineup because he made no prior identifications. Nelson and Collins were given the advisory form together but viewed the lineup separately.

- 17 -

¶ 55    Assistant State's Attorney (ASA) Dragana Bender testified that she worked felony review in late 2009; that is, she went to police stations and reviewed ongoing investigations including interviewing victims, witnesses, and suspects. She interviewed McClain on December 3, 2009, and he agreed to give a written statement. She typed a statement based on his answers, reviewed her draft with him, made corrections as needed, had him read a portion aloud to confirm he could read English, signed each page alongside McClain's signature, and attached a photograph of McClain to the statement. McClain had identified defendant in his statement, and he signed and wrote "Ralph" on a photograph of defendant also attached to the statement.

¶ 56    Bender read McClain's statement into the record as set forth above.

¶ 57    On cross-examination, Bender testified that she took McClain's statement over two hours after arriving at the police station, as she first reviewed reports and spoke with police and other investigators. It took her "a couple of hours" to take his statement. She typed the statement as he spoke but summarized his responses rather than recording then verbatim. McClain was not in custody, as he was not in handcuffs and she was told before interviewing him that he was a witness. She did not ask McClain if he was in custody. While she was "certain" she would have asked McClain if he drank on the night of the shooting, and acknowledged that it would be an important question, the statement did not reflect whether or how much he drank and Bender did not recall what his answer had been. She did not recall asking McClain about the lighting in the parking lot during the incident, nor if he had discussed the incident with his friends before her interview. When asked why corrections were needed after hours of preparation and interviewing before taking the statement, Bender replied "I don't think it makes a difference how much time you spend if you make a mistake." When asked what her understanding of how long McClain had been at the scene

before fleeing the gunshots, she replied, "I believe him to be there as long as it took him to observe what he talked about before he turned and started running."

¶ 58    ASA Daniel Faermark testified that he presented Carmen's testimony to the grand jury in December 2009 after interviewing her. He did not tell her what to tell the grand jury, and she did not tell him that anyone had told her what to say. She testified that she told defendant she was "afraid for the safety of myself and my kids because, you know, he was driving my car" and that he had replied by apologizing for having "ruined her life."

¶ 59                                    7. Miscellaneous Evidence

¶ 60    Percy Pinkdon, owner of Mr. Ricky's in November 2009, testified that his nightclub had a security video system with cameras indoors and outdoors and the recording equipment in a locked office. It was working properly on the night of November 21 to 22. On November 23, police asked him for video from the night in question, and he provided videos that "accurately and fairly depict" the interior and exterior of Mr. Ricky's that night. As smoking was not allowed indoors, a smoking area was set aside on a sheltered patio. Pinkdon knew Carmen for essentially her entire life, and she worked at Mr. Ricky's in 2009 as supervisor of women employees. Some of the video Pinkdon provided was shown at trial, and Pinkdon recognized the parking lot, entrance, and interior of Mr. Ricky's. If Mr. Ricky's parking lot was full, patrons "would park wherever they could park," and his video system did not cover the opposite side of the street.

¶ 61    On cross-examination, Pinkdon testified that he viewed about 10 to 12 hours of the video from Mr. Ricky's, not about 20 total hours of video from the various cameras, but what he viewed included all that was shown at trial. As the shooting did not occur on Mr. Ricky's property, Pinkdon

did not see it, though he was at the nightclub that night. When asked if he recognized defendant, he believed so but was not certain, and he did not know if defendant was a friend of Carmen.

¶ 62     Police detective Damon Griffin testified that he and other officers were patrolling a nightlife area around bar closing time on the early morning of November 22, 2009. At about 3 a.m., Griffin heard gunshots and drove in that direction. When he arrived, "a lot" of people were "running all over the place," and he saw more than one injured person on the ground. He and other officers tried to secure the area, and he learned that one of the injured men was apparently deceased. He called for paramedics and additional officers, who arrived while he was at the scene. On cross-examination, Griffin testified that he believed Mr. Ricky's closed at 3 a.m. It was "possible" with all the people and cars that a person trying to leave the parking lot where the shooting occurred would have been stuck in a line of departing cars. Griffin did not see defendant or a blue Impala despite arriving at the scene shortly after the gunshots. He did see a Lincoln in the parking lot, and some of the injured men "could have been" near it. On redirect examination, he testified that he had no description of any person or vehicle when he arrived at the scene.

¶ 63     The medical examiner testified about Moutry's autopsy, which showed seven gunshot wounds and various abrasions and lacerations to his body, and opined that he died of multiple gunshot wounds. Three wounds were to his back, two were to the back of his arms, and two were to his left hip. The hip wounds were consistent with a person turning away to flee while being shot, and it was impossible that Moutry was shot in the stomach or chest. Bullets were recovered from the body. Moutry's blood tested positive for cocaine, alcohol, and opiates, with a blood alcohol content "a little bit above the legal driving limit."

¶ 64    Forensic investigator Patrick Phillips testified to investigating the scene of the shooting, having been called there at about 3:45 a.m. and arriving there about 5:30 a.m. Moutry was dead at the scene, while other victims had been taken to the hospital, and there were fired bullets and pieces of the victims' clothing on the ground. Phillips photographed the scene, and he testified that certain photographs accurately depicted the scene on the night of the shooting. They included a Lincoln and Moutry's body, and some of the clothing was by the Lincoln. He recovered 3 fired bullets and 19 shell casings, 5 labeled 9-millimeter Luger and 14 labeled "9X9 S&B." He received from the medical examiner Moutry's clothing and bullets from his body. He went to the police station on December 8, 2009, and examined a blue Impala, including photographing it and collecting fingerprints. On cross-examination, Phillips testified that his photographs of the scene at about 6 a.m. would be lit differently than the scene at about 3 a.m. While he did not know which clothing belonged to which victim, he believed it belonged to victims as it had stains resembling blood. The bullets and shell casings were "throughout the parking lot," and he did not know if any had been kicked or otherwise moved after they fell. Moutry's body was at least 60 feet from the Lincoln.

¶ 65    The parties stipulated that, of the fingerprints found in Carmen's blue Impala, seven did not come from defendant and the rest could not be properly compared to his fingerprints.

¶ 66    The parties also stipulated that the recovered bullets were compared and two bullets from the crime scene and one from Moutry's body had been fired from one gun while the third bullet from the crime scene was fired by a different gun. When the recovered shell casings were compared, nine were fired from one gun, six were fired by a different gun, and the remaining four were not fired from the same gun as the nine casings but could not be identified or eliminated as

being fired by the same gun as the six casings. Three 9-millimeter "Luger caliber" semiautomatic pistols were recovered in February 2011 during the investigation of a home invasion by Ternell and Larnell Weston and Raunchino James. Nine of the shell casings in the instant case had been fired from one of those pistols, and one of the bullets herein could not be identified or eliminated as having been fired from the same pistol.

¶ 67                           D. This Trial–Defense Evidence

¶ 68    The parties stipulated that, when Elder was interviewed in the hospital on the day of the shooting, he was asked who Ralph was and replied that he did not know anyone named Ralph.

¶ 69    Carmen testified that police interviewed her at the police station on the night before her grand jury testimony. They told her that they were considering murder charges against her, and she was there for about eight hours. When the police took her statement that night, they conflated her account. For instance, she was scared for the safety of herself and her children because her home had been broken into twice since the shooting, but she never told defendant during their telephone call that she was scared for the safety of herself or her children. Police brought her to the grand jury and were present when she met with Faermark before her grand jury testimony; that is, she was never alone with Faermark. During this meeting, she gave Faermark "the statement I signed the night before in order to leave," which was "taken all out of context." She told him that she had been at the police station for eight hours the previous night. When she told him that the statement was not accurate, she was told to testify consistently with the statement. She testified to the grand jury that defendant said to her that he "f*** up" and "shouldn't have done that" in a low voice. However, she testified later that he spoke normally during their call. After her grand jury

testimony, she was taken back to the police station where she watched security video until she found herself inside the nightclub when the shooting occurred and then "was let go."

¶ 70    On cross-examination, Carmen testified that Faermark was not at the police station the night before her grand jury testimony but another ASA was there. When she went before the grand jury, Faermark was present but police were not. She drove herself to the police station the night before her grand jury testimony and the day she testified. Defendant may have apologized for ruining Carmen's life, but she explained, "that's something I say all the time." She was unsure whether he said he "f*** up." When she was viewing the video, she was not looking for herself entering the nightclub but trying to find herself around the time of the shooting. The nightclub was very busy that night, and it was difficult to find herself. Carmen denied ever discussing her testimony with defendant or his family, though she and defendant were close enough that he could borrow her car. Indeed, he drove her to the nightclub on the night in question. Of defendant's family, she knew only his daughter. She had seen defendant with K.T. as they were close friends.

¶ 71    On redirect examination, Carmen testified that, before trial, she had told an ASA named Torrie that her statement and grand jury testimony were inaccurate. The ASA told her that she would go to jail for perjury if she changed her account from her statement or grand jury testimony.

¶ 72                                E. Closing Arguments

¶ 73    During closing arguments, the State argued that the witnesses were not respectable citizens but their testimony was nonetheless corroborated and credible so that the State proved the charges of first degree murder and attempted first degree murder.

¶ 74    The defense argued that the State's eyewitnesses were all victims and friends so that none of them were disinterested. They had ample opportunity as friends who knew defendant to collude,

including by cell phone in the minutes and hours following the shooting, to identify defendant. That would explain Collins changing his accounts over time, including testifying a few months before the instant trial that he did not see the shooter and did not see anyone jump from a blue Impala that night. "He testified here that he previously testified in March of this same year and that then he testified he didn't know who the shooter was. But the State wants you to put a lot of focus on what Brendan Collins says. *** I agree, put a lot of focus on what Brendan says." The defense noted that the State called McClain as a witness but he testified to not remembering anything about the incident. The defense argued that McClain's statement, and Carmen's statement and grand jury testimony, were questionable. Carmen's testimony that defendant brought her to the nightclub and was there sometime before midnight did not prove that he was there when the shooting occurred, it was argued. The only evidence of defendant's motive was that Moutry laughed at defendant in the nightclub, which the defense argued to be inadequate motive for murder.

¶ 75    The State argued in rebuttal that "an act of disrespect" was the motive for the shooting and that it was not required to prove a motive, much less a good motive, for murder because murder is inherently unreasonable. The eyewitnesses did not have a motive to conspire to falsely implicate defendant, as "you'd have to believe that they want the real killers to go free." They also had essentially no opportunity to conspire at the chaotic scene before Nelson identified defendant as the shooter to a paramedic on the way to the hospital for his gunshot wounds and McClain similarly identified defendant later that morning. While Collins was initially uncooperative, it was not long before he identified defendant as the person who shot Moutry. The eyewitness accounts were corroborated by Carmen, who placed defendant and her blue Impala at the nightclub that night.

The ASAs and paramedic who testified to pretrial statements and identifications had no incentive to falsely implicate defendant, the State argued, and the changed accounts of McClain and Carmen were explainable by their closeness to defendant and K.T. Discrepancies in the eyewitness testimony, such as describing a friend's exit wound as an entry wound, were explainable by the suddenness and speed of the incident, the State argued.

¶ 76                              F. Verdicts and Judgment

¶ 77    Following closing arguments, instructions, and deliberations, the jury found defendant guilty of first degree murder and four counts of attempted first degree murder.

¶ 78    In addition to arguing the insufficiency of the evidence, defendant's posttrial motion argued in relevant part that the court erred in not admitting evidence of the prior shooting by Moutry against defendant, which was witnessed by Nelson and McClain. Defendant wanted to use that evidence to show the witnesses' motive to misidentify him as one of the shooters, and he argued that the court erred when it found the evidence irrelevant and then allowed the State to argue that there was no reason for the eyewitnesses to falsely implicate defendant as one of the shooters. The insufficiency claim noted that Collins stated before trial and testified in the first trial that he did not see the shooters but then testified in this trial that he saw the shooter and identified defendant.

¶ 79    At the motion hearing, the defense reiterated that Collins did not implicate defendant in the first trial. Regarding the prior shooting, the defense argued that it did not present or argue the shooting to the jury to show that the eyewitnesses had a reason to misidentify defendant as a shooter but the State took advantage of that by making a closing argument that the witnesses had no motive to misidentify defendant. The State argued that the prior shooting was potentially inculpatory as evidence of defendant's motive, there was no evidence all the eyewitnesses were

present at the prior shooting, and the prior shooting was admitted in the first trial to impeach Nelson, but Nelson was not asked about any prior shooting in this trial. In rebuttal, the defense argued that it was erroneous to find the prior shooting irrelevant even if it did not apply to every eyewitness. The court denied the posttrial motion.

¶ 80    Following a sentencing hearing, the court sentenced defendant to consecutive prison terms of 35 years for first degree murder and 21 years for each of the four counts of attempted first degree murder for a total of 119 years' imprisonment. This appeal followed.

¶ 81                                    III. ANALYSIS

¶ 82    On appeal, defendant contends that trial counsel rendered ineffective assistance by not obtaining transcripts of defendant's first trial to properly impeach Collins with his testimony that he did not see the shooters. Defendant also contends that the trial court erred by not admitting evidence of the prior shooting involving defendant and Moutry to establish that witnesses may have falsely identified defendant as one of the shooters here based on the prior incident.

¶ 83                              A. Ineffective Assistance

¶ 84    Defendant first contends that trial counsel rendered ineffective assistance by not obtaining transcripts of defendant's first trial to properly impeach Collins with his testimony that he did not see the shooters. The State responds that ineffectiveness cannot be shown because counsel did impeach Collins with a prior inconsistent statement.

¶ 85    To succeed on a claim of ineffective assistance of counsel, a defendant must establish both that counsel's performance fell below an objective standard of reasonableness and that, absent that deficient performance, there was a reasonable probability that the outcome would have been different. *People v. Jackson*, 2020 IL 124112, ¶ 90.

¶ 86 Whether and how to cross-examine or impeach a witness is generally a matter of trial strategy, which will not by itself support an ineffective assistance claim. *People v. Bell*, 2021 IL App (1st) 190366, ¶ 79. "However, the complete failure to impeach the sole eyewitness when significant impeachment is available is not trial strategy and, thus, may support an ineffective assistance claim." *People v. Salgado*, 263 Ill. App. 3d 238, 246-47 (1994).

"Finally, the defendant cites three cases for the proposition that '[r]eviewing courts find ineffective assistance of counsel where trial counsel fails to impeach a witness based on their [*sic*] prior inconsistent statements.' However, in all three cases, counsel made several errors only one of which was failing to impeach a witness. It was the cumulative effect of the errors that led the reviewing court to find counsel ineffective in each case." *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 43 (citing *People v. Vera*, 277 Ill. App. 3d 130, 139-41 (1995); *People v. Skinner*, 220 Ill. App. 3d 479, 486-87 (1991); *People v. Garza*, 180 Ill. App. 3d 263, 267-70 (1989)).

¶ 87 Here, we are reluctant to hold that trial counsel was ineffective because he sought to obtain transcripts of the first trial to use in impeachment in the instant trial but the court denied the request in a belief that defendant was not indigent and thus not entitled to free transcripts. Counsel told the court during the first trial that he was acting "essentially *pro bono*," but this did not persuade the court, and it found defendant to not be indigent. In the instant trial, in the specific context of counsel seeking transcripts to impeach Collins, the court reiterated its finding that defendant was not indigent when it stated that the defense was not entitled to free transcripts because defendant had private counsel. Counsel would have had to either raise funds from defendant's family and

friends to buy the transcripts, as he told the trial court, or purchase them at counsel's own expense. We are reluctant to find counsel's decisions objectively unreasonable under such circumstances.

¶ 88    Moreover, we find that any shortfall in counsel's representation in this regard did not prejudice defendant and indeed should fall under the aegis of trial strategy, as there was by no means a complete failure to impeach the sole eyewitness as set forth in *Salgado*.

¶ 89    The absence of impeachment of Collins with his testimony from the first trial that he did not see who shot him must be considered in light of the fact that he identified defendant as a shooter in his grand jury testimony and a written statement. The State would have met impeachment of Collins with the transcript of the first trial in the same manner that it met that testimony in the first instance: by confronting Collins with his statement and grand jury testimony and seeking their admission as substantive evidence.

¶ 90    The jury also heard Collins's shifting account from his testimony in the first trial, even if it was not presented with the most detailed picture of that shift from the transcripts. When Collins was asked if he had testified in the first trial to hearing a shot and fleeing without seeing who fired it, he replied "correct." Collins then testified in this trial that he could not recall who shot at him but explained the discrepancy as "I didn't ever say me" but instead testified as to who shot Moutry. Even without transcripts, the jury could weigh for itself whether testifying earlier to fleeing without seeing who fired the shot was inconsistent with admitting that he did not see who shot Collins himself but asserting that he did see who shot Moutry. Collins also admitted that he "didn't remember seeing anybody jump out of a blue Impala on" that night, which was further grist for the impeachment mill. Moreover, the defense closing argument included that Collins's inculpatory testimony was impeached by his testimony in the first trial to not seeing the shooters or a blue

Impala. Thus, the defense was not deprived of the opportunity to argue Collins's impeachment based on the first trial.

¶ 91    Finally, the absence of a fuller impeachment of Collins with his first-trial testimony must be seen in light of the other evidence against defendant. He was firmly placed at the nightclub on the night of the shooting, including by his friend Carmen. Alongside Collins, Nelson also testified in this trial that defendant was one of the shooters. McClain would not implicate him at trial but gave an inculpatory pretrial statement. Lastly, Collins, Nelson, and McClain identified defendant as one of the shooters on the day of the shooting while still being treated for their wounds, when the opportunity to confer about the shooting was slight at best.

¶ 92    In sum, we do not find a reasonable probability that impeaching Collins with transcripts of his testimony in the first trial would have changed the outcome of this trial. We conclude that counsel not doing so was not ineffective assistance.

¶ 93                                B. Admission of Evidence

¶ 94    Defendant also contends that the trial court erred by not admitting evidence of the prior shooting involving defendant and Moutry to establish that witnesses may have erroneously identified defendant as one of the shooters based on the prior incident. The State responds that the court did not abuse its discretion in excluding evidence of the earlier shooting as it was irrelevant.

¶ 95    The admission of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision absent an abuse of that discretion. *Bell*, 2021 IL App (1st) 190366, ¶ 53. A court will not be found to have abused its discretion with its evidentiary rulings unless no reasonable person would take the view adopted by the court. *Id.* Erroneous decisions on the admission of evidence are subject to harmless error analysis. *People v. King*, 2020

IL 123926, ¶ 40. Our supreme court has recognized three approaches to determining whether an error is harmless: whether (1) the error contributed to the defendant's conviction, (2) the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) the challenged evidence was duplicative or cumulative. *Id.*

¶ 96    Here, we find that the trial court did not commit reversible error by not admitting evidence of the earlier shooting in this trial. A major problem with that contention is that the court did not categorically exclude such evidence. In the first trial, the court allowed the defense to present evidence of the earlier shooting as impeachment. Nelson had testified that he never saw Moutry shoot at defendant, and the court allowed the defense to impeach Nelson with Carmen's account of the earlier shooting with Nelson present. In the first trial, the defense presented by stipulation Carmen's testimony that, about a month before Moutry was shot, Moutry had shot at her Impala with herself and defendant inside and Nelson present. Before the instant trial, the court initially denied a defense motion to introduce such evidence but then recalled and followed its earlier ruling that such evidence could be admitted to impeach Nelson. However, the defense did not then elicit from Nelson a denial that he ever saw Moutry shoot at defendant, as the State noted in argument on the posttrial motion. Therefore, by the time the court ruled that the defense could not ask Carmen about the bullet holes in her Impala, the defense had failed to open the door or lay a groundwork for such evidence on the same basis as the court had allowed it in the first trial.

¶ 97    Defendant contends that evidence of the prior shooting was relevant to show that the eyewitnesses had a motive to misidentify him as one of the shooters. However, such evidence would have also strengthened the State's case by providing a more plausible or comprehensible motive for the shootings than a brief interaction in the nightclub between defendant and Moutry.

The defense argued in the posttrial motion that the State took advantage of the absence of evidence of the prior shooting to argue that the eyewitnesses had no motive to falsely implicate defendant. However, the State made that argument in rebuttal against a defense argument that the eyewitnesses colluded against defendant, including raising the possibility that they conferred by cell phone in the minutes and hours after the shooting despite them being hospitalized for their gunshot wounds during that time. Notably, the defense also argued in closing that the State had presented a weak motive for defendant shooting Moutry and the others. Had the evidence in question been admitted to show the *eyewitnesses'* motive or bias to misidentify defendant, it would have also strengthened the evidence of *defendant's* motive to shoot Moutry. Under such circumstances, we find that evidence of the prior shooting was unlikely to change the outcome of the trial and excluding it did not contribute to defendant's conviction. We conclude that any error by the trial court in finding such evidence irrelevant was harmless beyond a reasonable doubt.

¶ 98                                    IV. CONCLUSION

¶ 99      Accordingly, the judgment of the circuit court is affirmed.

¶ 100    Affirmed.

**No. 1-17-2418**

| | |
|---|---|
| **Cite as:** | *People v. Layton*, 2021 IL App (1st) 172418 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 10-CR-4562; the Hon. Luciano Panici, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Sarah Curry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and James Byrne, Assistant State's Attorneys, of counsel), for the People. |