2022 IL App (2d) 210542-U
No. 2-21-0542
Order filed July 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CM-1313 |
| BRYAN D. STAHL, | ) ) | Honorable Michael W. Feetterer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Bridges and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: At defendant's trial for domestic battery based on the theory that he shoved his daughter's head into a shelf and gave her a black eye, trial counsel was not ineffective for (1) eliciting defendant's testimony that he did not shove his daughter but did shake her by the shoulders, (2) failing to clarify for the jury that the uncharged shoulder-shaking incident could not support a conviction, and (3) failing to object to a certain portion of the State's closing argument.

¶ 2    Defendant, Bryan D. Stahl, was charged with two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2016)), based on an incident in which he allegedly pushed the victim, his 15-year-old daughter, A.S. A jury found defendant guilty of count II, which alleged that defendant knowingly made insulting and provoking contact with A.S. when he pushed her (see *id.*

§ 12-3.2(a)(2)), and not guilty of count I, which alleged that defendant knowingly caused bodily harm to A.S. when he pushed her into a shelf, causing a black eye (see *id.* § 12-3.2(a)(1)). The trial court sentenced defendant to 12 months' conditional discharge. On appeal, defendant argues that he was denied the effective assistance of counsel, because his trial counsel (1) elicited testimony from defendant that, on one occasion, defendant "shook [A.S.'s] shoulders," (2) failed to clarify for the jury that the shoulder-shaking could not form the basis of a conviction, and (3) failed to object to the State's comment during closing argument that defendant " 'threatened' " a witness. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The evidence at defendant's jury trial established the following. A.S. testified that, in December 2017, she was 15 years old. She lived with defendant, who was her father, and her older brother C.S. in a small two-bedroom home in Fox River Grove. A.S. was homeschooled, worked at a church performing maintenance, and also worked for defendant in his construction business. A.S. liked working at the church, but she did not like working for defendant's construction business. A.S. did not work every day. On the days that she did work, A.S. would sometimes leave her house at 7 a.m. and not return until 7 p.m. In 2017, A.S. was not happy living at home.

¶ 5      A.S. testified that, at some point in December 2017, she argued with defendant. She could not recall the exact date or the nature of the argument but only that it occurred in the early afternoon. A.S. testified that, during the argument, defendant "was in almost like a state of rage and just, like, extreme anger." "[H]e was yelling and his voice was shaking when he was yelling because he was just very angry to the point where he couldn't really control himself." A.S. was "scared" and went to her bedroom. A.S. stood in front of a mirror on her bedroom wall, and defendant entered her room and approached her. She testified:

> "He grabbed the back of my head and he—like, he kind of—he gripped it and didn't—he didn't push it and let go, but grabbed it, like, how you would grab a ball. And he held it, and he slammed it into the corner of my shelf that was in my room right next to the mirror. And the corner of my eye, like right—right under my eye slammed into the point of the shelf."

According to A.S, defendant held A.S.'s head to the shelf for about five seconds. When defendant let go, A.S. was "freaking out." She "didn't know what had happened, and [she] thought the shelf had hit [her] eye. And then [she] looked in the mirror and saw that there was already a black eye starting to form as soon as it happened." A.S. testified that she and defendant "were just kind of in shock of what had just happened, and neither of [them] knew what to do." Defendant walked away, and she remained in her room.

¶ 6 A.S. testified that, about an hour after the incident, she and defendant, along with C.S., drove together to the church to work. According to A.S., on the way to the church, defendant offered to buy her makeup to conceal her black eye, which had darkened since the incident. Defendant also told her that, if anyone asked about her black eye, she needed to lie and say that she walked into a shelf. While at the church, the pastor's wife asked A.S. about her eye, and A.S. told her "what happened." When she was done working at the church, A.S. went home with defendant and C.S.

¶ 7 A.S. testified that, later that evening, she took a photograph of her black eye. The photograph was entered into evidence as People's exhibit No. 1. That same evening, A.S. told her friend H.S. what had happened. The next day, early in the morning, H.S. picked up A.S. and brought her to her house. A.S. remained at H.S.'s house, along with H.S.'s mother, Patricia C.

(Patricia)[1]. About two weeks later, Patricia took A.S. to the Harvard police station and A.S. met with Harvard police officer Spencer Smith. Patricia brought A.S. to the police station because A.S. did not want to go home. A.S. could not recall whether she told Smith that defendant offered to buy her makeup to cover the black eye or that defendant told her to lie about what had happened. She denied that she told defendant that she was going to tell the police that he had given her a black eye. When A.S. met with the prosecutors the week before trial, she could not remember which eye had been injured.

¶ 8      Patricia testified that, about one week before Christmas in December 2017, her 16-year-old daughter, H.S., brought A.S. home with her. Patricia observed A.S. to have a black eye. Patricia did not contact the police, because she knew that A.S. was in contact with defendant and because Patricia felt that the safest place for A.S. was with her. About two weeks after A.S. arrived at Patricia's house, defendant contacted Patricia. Patricia testified:

"I don't even know how he got my phone number, but he called my phone.

It was approximately 10:30 in the evening asking if I had [A.S.] at my house, and I did say yes. He then demanded that I bring her home immediately to him and he wouldn't call the police. And I had told him that I had to work the next day, it was 10:30 in the evening, and I was not going to drive her immediately back to Fox River Grove."

According to Patricia, she told defendant that she could bring A.S. to him the next day after she got off work. They agreed to meet at a McDonald's in Harvard the next day at 2:30 p.m.

_____

[1]At the time of the incident, Patricia C. had a different last name, which is used throughout the record. However, she testified at trial that her last name had changed since the incident.

¶ 9 Patricia testified that, the next day after work, she went home and picked up A.S. to bring her to defendant in Harvard. A.S. was "shaking, crying, very scared." Ultimately, Patricia decided to take A.S. to the Harvard police station. She told officers that she was supposed to bring A.S. to meet her father but that A.S. "was in fear of going back home to him." The Harvard police called defendant, who then drove to the police station. A.S. currently lived with Patricia.

¶ 10 H.S. testified that she was 19 years old and that A.S. was her "foster sister" and "[b]est friend." A.S. currently lived with Patricia, H.S., and her three sisters in Poplar Grove. H.S. testified that, on December 17, 2017, at about 5 or 6 a.m., she drove to A.S.'s house, picked her up, and brought her home with her. A.S. was "very upset and worried and concerned" and had a black eye. A.S. stayed at H.S.'s house for two weeks. After H.S. and Patricia brought A.S. to the police station, "CPS came and took her to a shelter."

¶ 11 Smith testified that he met with A.S. at the police station. A.S. "was visibly upset and nervous" and "[h]er left eye had a bruise on it." Smith did not photograph the bruise. Smith also met with defendant. Smith first spoke with him on the phone and requested that he come to the police station. Defendant went to the police station and told Smith that he did not know what was going on and that he just wanted A.S. to go home with him. Smith "filled [defendant] in on what was going on and kind of the process that was going to be taking place." Smith testified that defendant "seemed indifferent about the whole thing." It was evident to Smith that A.S. did not want to go home with defendant. A.S. went to a shelter and defendant went home. Defendant was not arrested at that time.

¶ 12 The State rested. The trial court denied defendant's motion for a directed verdict.

¶ 13 Defendant testified that he was 59 years old. He had two children: C.S., who was born on March 2, 1999, and A.S., who was born on March 18, 2002. Defendant worked as a dentist until

his wife was diagnosed with cancer in 2005. He then quit dentistry to take care of his wife and sold his dental practice. When his wife died in 2006, defendant did not return to dentistry but began remodeling homes and restoring antiques. Defendant also homeschooled both of his children.

¶ 14    Defendant testified that, during the weekend of Saturday, December 16, 2017, and Sunday, December 17, 2017, he did not have any problems or confrontations with A.S. Defense counsel asked defendant about Monday, December 18, 2017, and the following colloquy transpired:

"Q. Directing your attention to Monday, December 18th of 2018, that morning, did you have any disagreement with any member of your household?

A. Yes.

Q. And what was the nature of the disagreement?

A. We had a remodeling job to go to. So we—my truck was ready, trailer was hooked up Sunday night. We were supposed to be at the customer's at 9:00, and [A.S.] just wouldn't get up. Her bedroom door was locked. She wouldn't wake. So I'm like, knock, knock, get up, get up, we are going to be late for a customer.

Q. And was that in the morning of December 8—Monday, December 18?

A. Yes.

Q. Did it lead to a disagreement?

A. No disagreement. I just wondered, like, why are you not getting up. She wouldn't get up.

Q. Did she eventually get up?

A. Yes.

Q. And after she got up, then what did you do on Monday, December 18th of 2017?

A. She eventually—her bedroom door was locked, and then she unlocked the door. And then I went in and confronted her right next to her bed. She is standing up, and I shook her shoulders, I said what is wrong with you? Why won't you obey? Why will you not listen?

Q. At that time, did you take her head and shove it into a shelf?

A. Never.

* * *

Q. At any time during December of 2017, did you shove your daughter's head into a shelf in the home at Fox River Grove?

A. Never.

Q. More specifically, on December 16, 17[,] or 18?

A. Never.

Q. After this confrontation in the bedroom, did you go to the job?

A. Yes, we did.

Q. Okay."

Defendant then identified three photographs that were admitted as defense exhibits. He described them as depicting the job site that he, A.S., and C.S went to on Monday, December 18, 2017. He said they were taken by A.S., using defendant's cell phone. The photos each bear a date stamp of December 18, 2017. Defendant testified that, when they were done working for the day, they went out to dinner and then home.

¶ 15 Defendant testified that, when he woke up on Tuesday, December 19, 2017, he discovered that A.S. was gone. He drove around the neighborhood with C.S. looking for her. He also called and texted her. He contacted the Fox River Grove police and reported A.S. missing. A.S.

eventually texted defendant later that morning, but she did not tell him where she was. Over the next two weeks, defendant spoke with A.S. twice on the phone. During the first conversation, A.S. told him that "she wanted to be an emancipated minor" and that she loved him. During the second conversation, A.S. "said what would you say if I go to the police and told them you gave me a black eye."

¶ 16    Defendant testified that he eventually learned that A.S. was at Patricia's house. A.S. gave defendant Patricia's last name but she would not give him Patricia's first name. Using an Internet cell phone tracking app, defendant was able to determine where A.S. was located. On December 30, 2017, at 10:30 p.m., he contacted Patricia by phone, and they agreed to meet at McDonald's in Harvard the next day. Defendant went to McDonald's and was contacted by a Harvard police officer. Defendant then went to the Harvard police station and met with Smith. After meeting with Smith, defendant went home.

¶ 17    On cross-examination, the State asked defendant about what had happened on the morning of December 18, 2017. Defendant agreed that was upset with A.S. because they had a job at 9 a.m. and she was not awake. He agreed that when A.S. unlocked her door, he walked in her room and shook her by the shoulders. He agreed that he asked her what was wrong with her. He denied that he asked her why she would not obey. Defendant agreed that he was mad, but he disagreed that they were arguing. He also disagreed that he "grabbed the back of her" and "smashed her face into a shelf."

¶ 18    In closing, the State argued that it proved domestic battery based on A.S.'s testimony that defendant grabbed her head, pushed her into the corner of a shelf, and caused her to sustain a black eye. The State further argued that it proved that the contact was insulting and provoking, because A.S. left her home and Patricia and Smith described A.S. as visibly upset. The State further argued

that it proved bodily harm based on A.S.'s testimony that she sustained a black eye, the photograph of the black eye, and Patricia's and H.S.'s testimony that they saw the black eye.

¶ 19    In response, defense counsel pointed out that defendant was the first person to go to the police. Counsel asserted: "He knew he had done nothing wrong. He may have reprimanded a child that wouldn't get up that Monday morning and go to work, but he did nothing that is being alleged here." He argued that A.S.'s version of what happened was not believable. He pointed out the absence of any police photographs or witness statements. Counsel argued that People's exhibit No. 1, the purported photograph of A.S.'s eye, was unreliable. Counsel noted that A.S. admitted that she could not tell the prosecutor which eye had been injured. Counsel also asserted that A.S. never mentioned to the police that defendant asked her to cover the bruise and lie about what had happened. Counsel suggested that, if Patricia believed that defendant had done something "so outrageous," she would have called the police when A.S. reported it to her, yet she did not. Counsel also pointed out that, although A.S. testified that she told the pastor's wife what had happened, the State did not call the pastor's wife as a witness.

¶ 20    In its rebuttal argument, the State addressed defense counsel's emphasis on A.S.'s delay in going to the police. The State argued that A.S. "did what any 15-year-old would do, she went to her friends." The State continued:

"Even more, let's look at what the defendant didn't do after he smashed his daughter's face into a shelf. Did he go to the police? Sure. Did he report her missing? Potentially. But he threatened [Patricia]."

The State also commented on defendant's delay in finding A.S.:

"You mean to tell me in 2017 it took him two weeks? And then it was Patricia that brought [A.S.] to the police station. It was Patricia that explained the situation to the police."

¶ 21 The jury found defendant guilty of domestic battery as charged in count II, which alleged that defendant knowingly made insulting and provoking contact with A.S. when he pushed her (see *id.* § 12-3.2(a)(2)), and not guilty of domestic battery as charged in count I, which alleged that defendant knowingly caused bodily harm to A.S. by pushing her into a shelf, causing a black eye (see *id.* § 12-3.2(a)(1)).

¶ 22 Defense counsel filed a motion for a judgment notwithstanding the verdict, or alternatively, a new trial. Counsel later amended the motion. Counsel argued that the only act of battery the State cited in the information, opening statement, case-in-chief, and closing arguments was defendant's grabbing A.S.'s head, shoving it into a shelf, and holding it there for five seconds, causing a black eye. Yet—counsel noted—the evidence referenced another act that could possibly be construed as a battery: the instance of shoulder-shaking described by defendant. The problem, counsel noted, was that the State provided no notice that it was seeking a conviction based on that act. Had the court or defendant been given notice, "defendant could have successfully raised the affirmative defense of permissible, parental corporal punishment for a mere shoulder shake to a sleepy teenage daughter, and the defense and trial court would have sought to see the jury was properly instructed on the law surrounding parental disciplining." Counsel argued that defendant's act of shaking A.S.'s shoulders was permissible corporal punishment and that counsel was misled by the State into not raising the defense.

¶ 23 Counsel also claimed that the jury did, in fact, determine that the shoulder-shaking was a crime. Counsel provided his affidavit, in which he averred that, immediately after trial, he spoke with a named juror who informed him that the jury did not believe A.S.'s testimony that defendant grabbed her head and shoved it into a shelf, but the jury did believe defendant's testimony that he

shook A.S.'s shoulders. The juror added that, because the jury believed that the shoulder-shaking was insulting and provoking behavior, the jury found defendant guilty on count II.

¶ 24    Finally, counsel argued that the element of *corpus delecti* was not proven.

¶ 25    In response, the State argued that the trial count could not consider the juror's statements, because Illinois law does not permit evidence of the motive, method, or process with which the jury reached its verdict. The State also argued that it could not have provided notice to defendant that the jury would hear about the shoulder-shaking incident, as it did not know about the incident until defendant testified. In addition, the State noted that it never argued to the jury that the shoulder-shaking incident could be the basis for a conviction. The State also claimed that, aside from the inadmissible statement of the juror, defendant could not prove that the basis of the guilty verdict was defendant's admission that he shook A.S.'s shoulders.

¶ 26    Following a hearing, the trial court denied defendant's motion. The court noted that it is well settled that a statement by a juror after the jury has been discharged is not admissible to impeach the jury's verdict. The court noted that, although an exception exists where improper external influence on the jury is shown, this was not such a situation.

¶ 27    Thereafter, the matter proceeded to sentencing, and the trial court sentenced defendant to 12 months' conditional discharge, imposed a fine of $75 plus costs, fees, and assessments, and ordered defendant to attend and complete a parenting program.

¶ 28    This timely appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30    Defendant argues that he was denied his right to the effective assistance of counsel when trial counsel (1) elicited testimony from defendant that, on one occasion, defendant "shook [A.S.'s] shoulders," (2) failed to clarify for the jury that the shoulder shake could not form the basis of a

conviction, and (3) failed to object to the State's comment during closing argument that defendant " 'threatened' " Patricia.

¶ 31    To prove defendant guilty of domestic battery as charged in count I, the State had to prove beyond a reasonable doubt that defendant knowingly and without legal justification caused bodily harm to a family or household member. See 720 ILCS 5/12-3.2(a)(1) (West 2016). To prove defendant guilty of domestic battery as charged in count II, the State had to prove beyond a reasonable doubt that defendant knowingly and without legal justification made physical contact of an insulting or provoking nature with a family or household member. See *id.* §§ 12-3.2(a)(2).

¶ 32    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). That is, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Thus, to establish deficient performance, the defendant must overcome the presumption that, under the circumstances, the challenged action might be " 'sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A defendant must satisfy both prongs of the *Strickland* test, and the failure to satisfy either prong precludes a finding of ineffective assistance. *People v. Milton*, 354 Ill. App. 3d 283, 289 (2004).

¶ 33    Defendant first contends that defense counsel acted unreasonably when he elicited testimony from defendant that defendant "shook [A.S.'s] shoulders." According to defendant, there was no reason to question defendant about the incident, because the testimony did nothing to disprove the State's evidence and needlessly helped the State's case. We disagree.

¶ 34    First, defense counsel's line of questioning about the morning of Monday, December 18, 2017, went to the fact that the alleged incident could not have happened as the State's evidence suggested because, according to defendant's testimony, A.S. went to a job site with him that day. The testimony preceded the admission of photographs that defendant claimed were taken by A.S. at that job site that day. This testimony was important because it refuted testimony from the State's witnesses that the charged offense occurred during the afternoon of Saturday, December 16, 2017. If the jury believed defendant's testimony that A.S. was at a work with him on Monday, it would cast doubt on the testimony of the State's witnesses. We note that, contrary to defendant's argument, it is not entirely clear that defense counsel expressly elicited testimony from defendant that he "shook [A.S.'s] shoulders." To be sure, counsel expressly questioned defendant if he had "any disagreement [that morning] with any member of [his] household," and counsel further asked about the "nature of the disagreement." And defendant explained:

"We had a remodeling job to go to. So we—my truck was ready, trailer was hooked up Sunday night. We were supposed to be at the customer's at 9:00, and [A.S.] just

wouldn't get up. Her bedroom door was locked. She wouldn't wake. So I'm like, knock,

knock, get up, get up, we are going to be late for a customer."

Counsel later asked, "after [A.S.] got up, then what did you do on Monday, December 18th of

2017?" It was at that point that defendant testified that he "confronted" A.S. and "shook her

shoulders." However, in asking defendant what he did after A.S. got up, counsel could have

reasonably expected defendant to simply explain that they went to the job site.

¶ 35    Even if defense counsel should have anticipated that his questions would elicit defendant's

testimony that he "shook [A.S.'s] shoulders," we cannot say that counsel's line of inquiry was an

unreasonable trial strategy under the circumstances. Although defendant argues that there was no

need to bring up the shoulder shake for an effective defense, a reasonable defense attorney could

have concluded otherwise. The jury might have found defendant's admission that he "shook

[A.S.'s] shoulders" a more plausible alternative version of events than a blanket denial that he did

anything physical to A.S. In addition, the testimony would explain why A.S. left her home the next

morning and went to Patricia's house. It also provided a stronger basis for why A.S. would tell

him that "she wanted to be an emancipated minor" and why she would say "what would you say

if I go to the police and told them you gave me a black eye." The mere fact that defendant was a

strict parent could possibly have caused A.S. to leave home and make those statements. However,

defendant "[shaking] her shoulders" and verbally reprimanding her when she would not wake up

to go to a job that she did not enjoy would provide much stronger motivation to run away and

accuse defendant of giving her a black eye. Indulging, as we must, in the strong presumption that

counsel's conduct falls within the wide range of professional assistance, defendant has not

overcome the presumption that counsel's action was sound trial strategy. See *Strickland*, 466 U.S.

at 689.

¶ 36    We also reject defendant's argument that defense counsel was unreasonable in failing to clarify for the jury that defendant's act of shaking A.S.'s shoulders could not form the basis of a conviction. According to defendant, counsel could have drafted a jury instruction explaining that the shoulder shake "constituted lawful parental discipline." To be sure, Illinois common law recognizes reasonable parental discipline as an affirmative defense to domestic battery. See *People v. Green*, 2011 IL App (2d) 091123, ¶ 16; Restatement (Second) of Torts § 147(1) (1965) ("A parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his child as he reasonably believes to be necessary for its proper control, training, or education."). This defense balances a parent's right to privacy in raising children against the State's interest in preventing the mistreatment of children. See *Green*, 2011 IL App (2d) 091123, ¶ 14. It provides, like self-defense, legal justification for an otherwise criminal act. *Id.* ¶ 16. Here, however, defendant was not charged with domestic battery based on the shoulder shake. Indeed, the State made no mention of the shoulder shake in its closing argument. In addressing whether it met its burden of proving the element of "physical contact of an insulting or provoking nature," the State argued as follows:

> "What else do we know? We know that the defendant made physical contact of an insulting or provoking nature with [A.S.] in December of 2017. How do we know this? We know this because [A.S.] told us that he did. [A.S.] told us that in December of 2017, during an argument, the defendant grabbed the back of her head and he pushed her. He pushed her into the corner of a wooden shelf that was hanging in her room. He pushed her and she fell into the shelf. He pushed her and her face hit the corner of the shelf. He pushed her and he held her there for five seconds. And five seconds was plenty of time for [A.S.] to become

concerned that she couldn't see one [*sic*] of one eye anymore. It was long enough for [A.S.] to sustain a black eye."

Given the charges and the State's express argument as to the specific evidence that supported those charges, defense counsel had no reason to clarify for the jury that the shoulder shake was reasonable parental discipline that could not form the basis of a conviction. Thus, counsel was not unreasonable in failing to do so.

¶ 37 Lastly, defendant argues that defense counsel was ineffective for failing to object to the State's comment during closing argument that defendant " 'threatened' " Patricia. We disagree. " '[C]ounsel cannot be deficient if he fails to object to remarks which are not improper.' " *People v. Bell*, 2021 IL App (1st) 190366, ¶ 73 (quoting *People v. Johnson*, 218 Ill. 2d 125, 139 (2005)). "A prosecutor has wide latitude in making a closing argument and is permitted to comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Here, Patricia testified that defendant contacted her by phone after A.S. had been at her house for two weeks. She testified: "He *** demanded that I bring her home immediately to him and he wouldn't call the police." Obviously, this implies that defendant *would* call the police if Patricia did not comply, which could reasonably be viewed as a "threat" to call the police on Patricia. Accordingly, counsel was not ineffective in failing to object to the State's characterization of the testimony.

¶ 38                                 III. CONCLUSION

¶ 39 For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 40 Affirmed.